MADISON AVENUE INVESTMENT PARTNERS, LLC, and Madison Liquidity Investors 104, LLC, Plaintiffs,

v.

AMERICA FIRST REAL ESTATE INVESTMENT PARTNERS, L.P., America First Tax Exempt Investors, L.P., America First Apartment Investors, L.P., America First Capital Source I, L.L.C., America First Capital Associates Limited Partnership Two, and America First Capital Partnership Four, Defendants.

C.A. No. 19059.

Court of Chancery of Delaware, New Castle County.

Submitted: May 7, 2002.
Decided: July 25, 2002.

Richard D. Heins, Philip Trainer, Jr., and Tiffany L. Geyer, Ashby & Geddes, Wilmington, Delaware, for Plaintiff.

David A. Jenkins, Smith, Katzenstein & Furlow, LLP, Wilmington, Delaware, and David L. Stein, and Robert P. Haney, Covington & Burling, New York, New York, for Defendants.

## OPINION

LAMB, Vice Chancellor.

This is a books and records action brought by two limited partners against three Delaware limited partnerships and their general partners. For the reasons that follow, I will grant in part and deny in part plaintiffs' requests.

### I.

Plaintiffs Madison Avenue Investment Partners, LLC ("Madison Avenue") and Madison Partnership Liquidity Investors 104, LLC ("MLI 104")(collectively "Madison" or "Plaintiffs"), are both Delaware limited liability companies. Madison manages about $50 million in assets and invests in limited partnership interests, creditor claims and bankruptcy estates. Madison Avenue is a unit holder of defendants America First Apartment Investors, L.P. ("Apartment Investors") and America First Tax Exempt Investors, L.P. ("Tax Exempt Investors"). MLI 104 is a unit holder of America First Real Estate Investment Partners, L.P. ("Real Estate Investment Partners")(collectively the "Partnerships," "Defendants" or "America First"). Defendant America First Capital Source I, LLC, a Delaware limited liability company, is the general partner of Real Estate Investment Partners. Defendant America First Capital Associates Limited

Partnership Four, a Delaware limited partnership, is the general partner of Apartment Investors. Defendant America First Capital Associates Limited Partnership Two, a Delaware limited partnership, is the general partner of America First Tax Exempt Investors, L.P.

The units of Apartment Investors, Tax Exempt Investors and Real Estate Investment Partners each trade on NASDAQ and make periodic public disclosures according to SEC reporting requirements. The Partnerships are subject to agreements of limited partnership (the "Partnership Agreements"). Section 9.01 of each Partnership Agreement, despite slight differences in wording, provides unit holders with a right to inspect the books and records of the respective Partnership.[1] The standard these Partnership Agreements set for access to books and records is "for any purpose reasonably related to such Partner's or Unit Holder's interest in the Partnership" for Real Estate Investment Partners and "at the reasonable request ... of any Partner or [unit holder]" for Apartment Investors and Tax Exempt Investors. The Partnerships are subject to the Delaware Revised Uniform Limited Partnership Act ("DRULPA"), Section 17–

305 of which relates to books and records requests. The standard this statute sets for access to books and records is "upon reasonable demand for any purpose reasonably related to the limited partner's interest as a limited partner."

Since purchasing units in the Partnerships, Madison attempted on more than one occasion to sell its units to the general partner, demanding a premium to the market price in each instance. On January 30, 2001, Madison contacted the general partner of Real Estate Investors to demand that the partnership be liquidated. On March 22, 2001, Madison demanded access to the Real Estate Investors' books and records, with the stated purpose of determining "whether to increase its holdings and whether liquidation would be in the best interests of the respective limited partners and shareholders, and also ... to contact the respective limited partners and shareholders to determine whether they wish to sell their interests and to determine whether they wish to call Partnership or shareholder meetings for the purpose of liquidating the entities."

In three separate letters, each dated July 19, 2001, claiming rights pursuant to the Partnership Agreements and the

---

1. "SECTION 9.01. BOOKS AND RECORDS. The Partnership shall maintain its books and records at its principal office. The Partnership's books and records shall be available during ordinary business hours for examination and copying there at the reasonable request, and at the expense, of any Partner or Unit Holder or his duly authorized representative, or copies of such books and records may be requested in writing by any partner or Unit Holder or his duly authorized representative, in each case for any purpose reasonably related to such Partner's or Unit Holder's interest in the Partnership, provided that the reasonable costs of fulfilling such request, including copying expenses, shall be paid by the Partner or Unit Holder making such request. The Partnership's books and records shall include the following: (a) a current list of the full name, last known home or business address and Partnership Interest of each Partner and Unit Holder set forth in alphabetical order; (b) a copy of this Agreement and the Certificate, together with executed copies of any powers of attorney pursuant to which such Certificate, and any amendments thereto, have been executed; (c) copies of the Partnership's federal, state and local income tax returns and reports, if any, for the three most recent years; (d) copies of the financial statements of the Partnership for the three most recent years; and (e) all appraisals, if any, obtained with respect to the Properties (which appraisals shall be maintained for at least five years)." America First Real Estate Investment Partners, L.P., Form S–4, as filed with the SEC, at D–22 (Nov. 8, 1999).

DRULPA, Madison requested access to certain books and records of Apartment Investors, Tax Exempt Investors and Real Estate Investment Partners. Specifically, Madison Avenue requested of Apartment Investors and Tax Exempt Investors access to: (i) all mortgage, loan, note and debt agreements for the Partnerships; (ii) all appraisals for all real estate related to the Partnerships' mortgage investments; (iii) all financial statements and operating results for the real estate related to the Partnerships' mortgage investments; and (iv) any and all documents that provide information relating to the value of the Partnerships. MLI 104 requested of Real Estate Investment Partners access to: (i) all limited partnership agreements and other agreements between the Partnership and the subsidiary operating partnerships (as defined in the partnership's most recent 10–K); (ii) all mortgage, loan, note and debt agreements for both the partnership and the subsidiary operating partnerships; (iii) all appraisals for all real estate held or owned by the partnership or the subsidiary operating partnerships; and (iv) all financial statements and operating results relating to the subsidiary operating partnerships and/or real estate held or owned by the partnership and/or the subsidiary operating partnerships; and (v) any and all other documents that provide information relating to the value of that partnership.

Each request stated Madison's purpose in seeking access to the specified books and records as "to properly value its investment." At the time, Madison had made investments of approximately $1.6 million in Real Estate Investment Partners, $10,000 in Apartment Investors and $10,000 in Tax Exempt Investors.

In its July 31, 2001 reply to Madison's requests, America First agreed to provide the following documents: (i) copies of publicly available financial statements for the past three years for all three Partnerships, and (ii) any and all appraisals obtained with respect to real property in which Real Estate Investment Partners and Apartment Investors had an ownership interest for the past five years.

Madison decided that the information America First was prepared to disclose was inadequate to allow for a proper valuation of its investment. For example, limiting the appraisals to be produced to real property in which the Partnerships had held an ownership interest for five consecutive years prevented Madison from access to appraisals of all properties that had been acquired within the past five years. Similarly, limiting access to publicly available information prevented Madison from seeing and analyzing the details of financial information relating to the subsidiary limited partnerships under the control of Real Estate Investment Partners.

Dissatisfied with this response, Madison filed this action on August 16, 2001, seeking to compel access to documents it regards as necessary to properly value its investments. Madison's complaint alleges that America First's failure to furnish the books and records it sought was wrongful and that (i) America First is in breach of the Delaware Revised Uniform Limited Partnership Act; (ii) America First is in breach of Section 9.01 of each Partnership Agreement; and (iii) America First breached its fiduciary duties to Madison.[2] The Madison complaint also seeks damages as a result of the costs it has been

---

**2.** Because Plaintiffs cite 6 *Del. C.* § 17–305 (2001) and the Partnership Agreements as the source of this fiduciary duty, the disposition of Plaintiffs' statutory and contract claims will dispose of the fiduciary duty claim as well.

forced to incur in seeking to enforce its rights to obtain books and records.

Trial was held on April 2, 2002. Thereafter, America First produced to Madison: (i) financial statements for the past three years for each limited partnership, but not any non-public financial statements, and (ii) appraisals performed during the last five years for properties in which Apartment Investors or Real Estate Investment Partners held an ownership interest.

Hence, the following books and records remain in dispute: (i) Partnership Agreements between Real Estate Investment Partners and its subsidiary operating partnerships; (ii) mortgage, loan, note and debt agreements for each of the Partnerships (and for the subsidiary operating partnerships in the case of Real Estate Investment Partners) in which Defendants have had an interest for the past three years; and (iii) financial statements and operating results relating solely to the real estate held by the Partnerships (and the subsidiary operating partnerships in the case of Real Estate Investment Partners).

Defendants seek dismissal of this suit, or a judgment limiting the scope of Plaintiff's document request to those documents it has already produced.

## II.

This action is brought pursuant to Section 17–305 of Delaware's Revised Uniform Limited Partnership Act.[3] This statute provides limited partners with the right to inspect, among other things, "information regarding the status of the business and financial condition of the limited partnership" and "other information regarding the affairs of the limited partnership as is just and reasonable." This statutory right is limited by three conditions, which provide the standard for whether documents or information are to be furnished when a dispute arises.

First, the limited partner must establish that it has complied with the provisions respecting the form and manner of making demand for obtaining such information.[4] It is conceded that Plaintiffs have complied with these provisions. Second, the demand must be reasonable and for a purpose reasonably related to the limited partner's interest as a limited partner.[5] This condition is the basis for the proper purpose analysis made below. Third, the right is subject to such reasonable standards "as may be set forth in the partnership agreement or otherwise established by the general partners."[6] This condition is the basis for the analysis made below of what items constitute "books and records" of the Partnerships. In addition, Section 17–305(b) of the DRULPA allows general partners to refuse disclosure to limited

---

**3.** 6 *Del. C.* §§ 17–305 (2001); which is patterned after 8 *Del. C.* § 220 (2001).

**4.** 6 *Del. C.* § 17–305(e) (2001). ("When a limited partner seeks to obtain the information described in subsection (a)(3) of this section, the limited partner shall first establish (1) that the limited partner has complied with the provisions of this section respecting the form and manner of making demand for obtaining such information, and (2) that the information the limited partner seeks is reasonably related to the limited partner's interest as a limited partner.").

**5.** *Id.*

**6.** "Each limited partner has the right, subject to such reasonable standards (including standards governing what information and documents are to be furnished, at what time and location and at whose expense) as may be set forth in the partnership agreement or otherwise established by the general partners, to obtain from the general partners from time to time upon reasonable demand for any purpose reasonably related to the limited partner's interest as a limited partner...." 6 *Del. C.* § 17–305(a) (2001).

partners of any information that the partnership is required by law or contract to keep confidential or which might damage the partnership if disclosed.[7] This condition is the basis for the scope of inspection analysis made below.

As noted above, the Partnership Agreements also contain provisions expressly addressing the right of limited partners to obtain information. In some cases, those provisions are more liberal than the correlative statutory rights. For instance, the Agreements for both Tax Exempt Investors and Apartment Investors provide that books and records are available "upon reasonable request" without specifying a proper purpose requirement.[8] Madison does not proceed under any of these provisions because, all parties agree, the documents Madison seeks are not included in the description of documents available under this separate contract right. Nonetheless, the Defendants argue that the Partnership Agreements are relevant to the court's analysis because, they say, those agreements operate to limit Madison's inspection rights to the categories of documents listed in the Partnership Agreements.

There are four inquiries that must be made to determine whether Plaintiffs' statutory and contract based rights are restricted in this case. First, are the documents and information sought by Plaintiffs in fact "books and records" of the Partnerships? Second, have Plaintiffs stated a proper purpose for their request? Third, what is the proper scope of inspection given Plaintiffs' purpose? Finally, what issues, if any, remain with regard to access to information or documents relating to subsidiaries of the Real Estate Investment Partners entity?

## A. Are The Documents And Information Sought By Plaintiffs In Fact "Books And Records"?

Before turning to the language of the Partnership Agreements at issue, the court notes some uncertainty as to whether a limited partnership agreement may, by adopting "standards governing what information and documents are to be furnished" (as authorized by Section 17–305(a)), restrict or usurp a limited partner's right of access to categories of documents described in Section 17–305(a) itself. Commentators have expressed the view that the power to set standards encompasses a broad power to regulate and restrict the right of access to information.[9] Generally, however, the acknowledgement in a statute of the power to adopt "standards" to govern a right therein created

7. "A general partner shall have the right to keep confidential from limited partners for such period of time as the general partner deems reasonable, any information which the general partner reasonably believes to be in the nature of trade secrets or other information the disclosure of which the general partner in good faith believes is not in the best interest of the limited partnership or could damage the limited partnership or its business or which the limited partnership is required by law or by agreement with a third party to keep confidential." 6 *Del. C.* § 17–305(b) (2001).

8. By contrast, the Partnership Agreement for Real Estate Investors states that a Partner or Unit Holder may request access to the books and records "for any purpose reasonably related to [its] interest in the Partnership."

9. "It is generally recommended that a partnership agreement contain provisions setting forth reasonable standards for providing limited partners with information concerning a limited partnership and their investment in the partnership. Such standards typically include a description of what information and documents will be furnished by a general partner." MARTIN I. LUBAROFF & PAUL M. ALTMAN, DELAWARE LIMITED PARTNERSHIPS § 5–6 at 5–2 (2000).

would not necessarily authorize the adoption of "standards" that substantively reduce the right itself defined in the statute. Because the court concludes, *infra*, that the Partnership Agreements should not be read to restrict the statutory right of access, it is unnecessary to address this question. In addition, the court notes that the recent enactment of Section 17–305(f) will change this analysis for any partnership agreements subject to it.[10] The court now turns to the issue presented.

Under Section 17–305(a) of the DRULPA, the right to obtain books and records from the general partner is expressly made subject to "such reasonable standards ... as may be set forth in the partnership agreement or otherwise established by the general partner[ ]." In addition, such standards may "govern[ ] what information and documents are to be furnished...."[11] There is no evidence in this case that the defendant general partners ever "established" standards governing access to information. There is, however, a question as to whether the relevant portions of the Partnership Agreements themselves restrict the scope of documents that are subject to the right of inspection described in Section 17–305(a). This issue

arises because the list of documents subject to inspection found in the Partnership Agreements is less extensive than that found in the statute. In particular, the Partnership Agreements omit the catch-all provision found in Section 17–305(6), as follows: . "other information regarding the affairs of the partnership as is just and reasonable." Because the documents remaining at issue in this case are not specifically identified in the Partnership Agreements (but do fall within one or more categories of Section 17–305(a)), the court must determine whether the enumeration of documents in the Partnership Agreements supplants and limits a limited partner's rights under the statute, or is merely a listing of documents required to be maintained by the Partnerships and available for inspection separately as a matter of contract.

█ The Partnership Agreements are contracts to be construed like any other contract.[12] The Partnership Agreements stipulate that: "The Partnership's books and records shall include" and proceed to list categories of documents that either never were or are no longer at issue in this case.[13] Defendants argue that the use of

---

10. The ability to expressly restrict what constitutes the "books and records" of a partnership has now been made clear by amendments to the DRULPA, which became effective August 1, 2001, and which include the addition of subsection (f) to Section 305, as follows: "The rights of a limited partner to obtain information as provided in this section may be restricted in an original partnership agreement or in any subsequent amendment approved or adopted by all of the partners and in compliance with any applicable requirements of the partnership agreement. The provisions of this subsection shall not be construed to limit the ability to impose restrictions on the rights of a limited partner to obtain information by any other means permitted under this section." 6 *Del. C.* § 17–305(f) (2001). The stated purpose for adding this subsection to the

statute was "to permit a partnership agreement to further restrict the rights of a limited partner to obtain information." 73 Del. Laws, c. 73, § 20 (2001).

11. 6 *Del. C.* § 17–305(a) (2001).

12. *Arbor Place, L.P. v. Encore Opportunity Fund, L.L.C.*, 2002 WL 205681, at *3, Chandler, C. (Del.Ch. Jan. 29, 2002).

13. These are: "(a) a current list of the full name, last known home or business address and Partnership Interest of each Partner and Unit Holder set forth in alphabetical order; (b) a copy of this Agreement and the Certificate, together with executed copies of any powers of attorney pursuant to which such Certificate, and any amendments thereto, have been executed; (c) copies of the Partner-

the words "shall include" in the Partnership Agreements effectively delimits the term "books and records" to those items listed for purposes of these agreements. Plaintiffs respond that the items listed are merely those that Defendants are expressly required to maintain and should not be read as describing the universe of the books and records to which partners and unit holders are entitled access under the statute.[14]

■ The primary definition of the word "include" is one of confinement, being based as it is on the Latin word "inclaudere" which means "to shut in."[15] But, the word also "may, according to context, express an enlargement and may have the meaning of *and* or *in addition to*. Here, the context suggests that the phrase "shall include" was not used to confine the statutory right of inspection to the items listed in the Partnership Agreements. For example, two of the three Agreements expand on the statutory right by creating a correlative contract right without any "proper purpose" requirement. Moreover, all of the Agreements omit essential terms of the statute relied upon by the general partners, such as the right to keep confidential certain information. These facts suggest that the Partnership Agreements need to be interpreted in tandem with the statute. Moreover, it would have been a simple matter for the drafters of these provisions to include language clearly stating an intention to supplant or restrict the statutory right of inspection.[16] Taken together, these factors lead the court to conclude that the Partnership Agreements do not operate to limit the scope of inspection available under the statute.

■ The items Plaintiffs seek easily fall within the ambit of their statutory right to "[t]rue and full information regarding the status of the business and financial condition of the limited partnership" and "[o]ther information regarding the affairs of the limited partnership as is just and reasonable." Because that right is not limited by

ship's federal, state and local income tax returns and reports, if any, for the three most recent years; (d) copies of the financial statements of the Partnership for the three most recent years; and (e) all appraisals, if any, obtained with respect to the Properties (which appraisals shall be maintained for at least five years)." for Apartment Investors and Real Estate Investment Partners. For Tax Exempt Investors there is no item (e).

14. The word "shall" is generally used as a command or requirement, but in some circumstances is not even that strictly construed. *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434 n. 9, 115 S.Ct. 2227, 132 L.Ed.2d 375 (1995) ("Though 'shall' generally means 'must,' legal writers sometimes use, or misuse, 'shall' to mean 'should,' 'will,' or even 'may.'" *See* D. MELLINKOFF, MELLINKOFF'S DICTIONARY OF AMERICAN LEGAL USAGE 402–03 (1992) ("shall" and "may" are "frequently treated as synonyms" and their "meaning depends on context); B. GARNER, DICTIONARY OF MODERN LEGAL USAGE 939 (2d ed.1995) ("Courts in virtually every English-speaking jurisdiction

have held–by necessity–that *shall* means *may* in some contexts, and *vice versa*.")). Had the agreement been worded "shall be" or "shall consist of," however, Defendants' position would be stronger. Because of the presence of the word "include," Plaintiffs' position on this point is more sensible.

15. BLACK'S LAW DICTIONARY, p. 687 (5th Ed., 1979).

16. *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 291 (Del.1999) ("The basic approach of the Delaware Act is to provide members with broad discretion in drafting the Agreement and to furnish default provisions when the members' agreement is silent."). Here, for instance, the agreements could have provided that the right of inspection "shall include and be limited to" the itemized categories of documents. Or, they could have specifically referred to Section 17–305(a) and specified that the itemized documents were all that would be made available pursuant to that section.

the Partnership Agreements, the court concludes that the items sought by Plaintiffs are "books and records" of the Partnerships.

## B. Have Plaintiffs Stated A Proper Purpose For Their Request?

Having established that the items Plaintiffs seek are "books and records," the next inquiry is as to whether Plaintiffs have stated a proper purpose for their request. The pertinent standard is, as follows: "[The] limited partner's right to inspect books and records and to otherwise access information regarding the partnership is limited to 'purpose[s] reasonably related to the limited partner's interest as a limited partner.'"[17] Madison claims that it has stated a proper purpose: "It is settled law in Delaware that valuation of one's shares is a proper purpose for the inspection of corporate books and records."[18] Moreover, once an acceptable primary purpose is established, any secondary purpose or even ulterior motive is irrelevant.[19] However, the burden to prove a proper purpose is on the plaintiff and more than a general statement is required in order for the court to determine the propriety of the demand.[20] If the court is not satisfied as to the propriety of the plaintiff's purpose, it may deny the books and records request: "[E]ven if a proper purpose for a demand is demonstrated and such demand is shown to be reasonably related to a plaintiff's interest as a stockholder, nonetheless such demand must not be for a purpose adverse to the best interests of the [entity]."[21]

Valuing one's investment is generally considered to be a proper purpose reasonably related to one's interest.[22] Defendants do not quarrel with the propriety of Madison's stated purpose. Rather, they allege that Madison has misstated its true purpose. The stated purpose of valuing its investment is not credible, they argue, for five reasons that will be addressed in turn.

First, they say, the evidence shows that Madison has already valued its investment in Real Estate Investors using publicly available information and that similar valuations of its investment in Apartment Investors and Tax Exempt Investors are also possible, but have not been performed due to the small investment it has in each of those entities. Madison responds that the fact that some sort of valuation has been or could be performed with the information that is publicly available does not render "improper" a purpose to produce a *better* valuation.

Second, Defendants argue that Madison has been unable to articulate any concrete reason that the documents at issue would be relevant to a valuation. Madison, in response, refers to the trial testimony of its Vice President of Corporate Development, Ward Dietrich. Dietrich testified that the limited partnership agreements and other agreements between Real Estate Investment Partners and its subsidiary operating partnerships (which are not publicly available), would be help-

---

17. 6 *Del. C.* § 17–305(e) (2001).

18. *Radwick Pty., Ltd. v. Medical, Inc.*, 1984 WL 8264 at *2, 1984 Del.Ch. LEXIS 554 at *5–6 (Del.Ch. Nov. 7, 1984).

19. *Id.*

20. *Skouras v. Admiralty Enterprises, Inc.*, 386 A.2d 674, 678 (Del.Ch.1978).

21. *Id.* In the case of a stockholders list (or partners list) the burden shifts to the company to establish that the inspection plaintiff seeks is for an improper purpose.

22. *Helmsman Management Services, Inc. v. A & S Consultants, Inc.*, 525 A.2d 160 at 164–65 (Del.Ch.1987).

ful to value Madison's investment because they would disclose contractual responsibility on the part of those subsidiary entities to pay a portion of their value upon liquidation to either a third party and/or the general partner. Dietrich also testified that the mortgage loan, note and debt agreements for the Partnerships would reveal whether any loan documents or debt facilities of the limited partnerships provide for a penalty upon prepayment, or similar provisions, that would serve to reduce the value of the Partnerships. Finally, Dietrich testified that it was not possible to fully understand the values of the individual real estate investments held by the Partnerships (and the subsidiaries of Real Estate Investment Partners) without financial statements showing the results of operations broken down by asset.

Third and fourth, Defendants contend that the pattern of Madison's conduct and the fact that Madison earlier stated more general purposes for its other request combine to discredit Madison's claim that its purpose in seeking these documents is to value its investment. Specifically, Defendants contend that because Madison's books and records request was made only after the Partnerships refused to repurchase Madison's units at a premium to the market price, an improper purpose lurks in the current books and records request. In addition, Defendants contend, given that Madison is in the business of making tender offers and it has not stated whether or not it will make a tender offer to other unit holders, Madison is attempting to hide its true purpose.[23]

■ Defendants rely on *In re Paine Webber* for the proposition that, as a matter of Delaware law, considering whether to acquire additional units is not a "proper purpose" under DRULPA.[24] They misread *Paine Webber*. In that case, plaintiffs sought a list of limited partners and were unclear about their purpose in demanding it. After much back and forth on the subject, during which plaintiffs included, among others, the purpose of valuing their investment as one of their reasons for seeking the list, it became clear that they had been attempting to hide their true purpose, which was to make the list available to a yet-to-be-formed investment fund in return for equity participation in the fund.[25] The court found that purpose to be improper. The *Paine Webber* case is inapplicable to the facts in this case because Madison has been clear about its purpose ("to value its units") from the beginning and there is no evidence that it shares the purpose found to be improper in *Paine Webber*. As noted above, once an acceptable primary purpose is established, any secondary purpose or even ulterior motive is deemed to be irrelevant.[26]

■ Defendants' fifth and final contention as to the credibility of Madison's purpose is that, based on the small amount Madison has invested in Apartment Investors and Tax Exempt Investors, it is more likely seeking to determine whether to purchase additional units in those entities than it is trying to value its investment in them. Because determining its units' value is a proper purpose and the only reason one would do so is to decide whether to buy, sell or hold units, the size of Madi-

---

23. Madison insists that it has made no decision to launch any tender offer, and there is nothing in the record to prove otherwise.

24. *In re Paine Webber Ltd. Partnerships*, C.A. No. 15043, 1996 WL 535403, Jacobs, V.C. (Del.Ch., Sept. 17, 1996).

25. *Id.* at *3.

26. *Skouras*, 386 A.2d at 678.

son's investment is irrelevant to the propriety of its purpose.[27]

■ To some extent, Defendants' concern reflects a fear that Madison will attempt to gain an unfair informational advantage over the others, including existing limited partners, with the information it has requested. This is a legitimate concern and one that Defendants are empowered by the DRULPA to address.[28] To allay these concerns and give effect to the statutory rights of the general partners, the final order will condition the right of access granted to Madison on the execution of a satisfactory confidentiality agreement governing the treatment of the documents and information made available to Plaintiffs.

For these reasons, the court concludes that Plaintiffs have established a proper purpose and that Defendants have not shown that this primary purpose–to value its investment–is a subterfuge concealing another, improper purpose.

## C. What Is The Proper Scope Of Inspection Given Plaintiffs' Purpose?

■ Inspection rights are "limited to those documents that are necessary, essential and sufficient for the shareholder's purpose."[29] The plaintiff must describe "with reasonable particularity [its] purpose and the records [it] desires to inspect."[30] Nevertheless, as one of the leading treatises on valuation techniques states, "valuation is as much an art as a science and · is inherently imprecise."[31] With this in mind, the court turns to the reasons Madison gives as to why the information it seeks is "necessary, essential and sufficient" to properly value its investment.

First, Madison wants the limited partnership · agreements between Real Estate Investment Partners and its subsidiaries to determine whether those subsidiaries have any obligation—upon liquidation—to pay a portion of value to a third party, which might reduce the units' value. Second, Madison wants all mortgage, loan, note and debt agreements for the Partnerships (and the Real Estate Investment Partners subsidiaries) to check for provisions that may reduce the units' value. Third, Madison wants all non-public financial statements specifically relating to the real estate held or owned by the partnerships (and the Real Estate Investment Partners subsidiaries) in order to understand, in isolation, the revenue generating capacity of those properties through both the revenues and expenditures on each property. Plaintiffs note that the aggregate values that are presented in the pub-

27. The right to inspect and copy documents is not "condition[ed] ... on any minimum threshold investment on the part of the stockholder." DONALD J. WOLF & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 8–6[a] at 8–56 (2001)(referring to Section 220).

28. Under Section 17–305(b): "A general partner shall have the right to keep confidential from limited partners for such period of time as the general partner deems reasonable, any information which the general partner reasonably believes to be in the nature of trade secrets or other information the disclosure of which the general partner in good faith believes is not in the best interest of the limited

partnership or could· damage the limited partnership or its business or which the limited partnership is required by law or by agreement with a third party to keep confidential."

29. See e.g. Magid v. Acceptance Ins. Cos., 2001 WL 1497177 at *3, 2001 Del.Ch. LEXIS 141 at *10 n. 10, Jacobs, V.C. (Del.Ch., Nov. 15, 2001).

30. Thomas & Betts Corp. v. Leviton Mfg. Co., 681 A.2d 1026, 1031 (Del.1996).

31. TOM COPELAND, TIM KOLLER, JACK MURRIN, VALUATION, p. 293–4 (3rd ed., John Wiley & Sons, Inc.2000).

lic filings do not permit it to get beneath the surface of these investments to see what shape their component parts are in. Madison's testimony does appear to describe "with reasonable particularity [its] purpose and the records [it] desires to inspect." [32]

Defendants respond, generally, that the salient information to be divined from each of these categories is all publicly available due to the SEC disclosure requirements and further that Madison's assertions that there "might" be information of use to make their calculations is insufficient to carry the burden that the documents at issue are "necessary" or "essential." Plaintiffs, on the other hand, note that Defendants' assertion that the information sought is not necessary to value the partnership units is inconsistent with their purported fear that disclosure of this information would give Plaintiffs an unfair advantage in the market. Also, Plaintiffs point out that while most limited partnerships have a built-in liquidation date, the partnerships at issue in this case were either merged or rolled up into new entities without being liquidated, in order to become publicly traded. While the units are now liquid, in that they can easily be bought and sold, Plaintiffs contend that without a date certain for liquidation there is no way to determine whether the market price reflects the "intrinsic value" of the units.

 Finally, Defendants argue that Madison's relatively small investments in Apartment Investors and Tax Exempt Investors do not justify the cost of pulling together the information regarding those entities. While a relevancy versus burden analysis is an appropriate consideration, it is not dispositive when it comes to determining whether or not a plaintiff is entitled to certain information.

It is fair to conclude that Madison seeks to obtain a *better* valuation of its investment than is possible using only the market price for units and the information that is publicly available in SEC filings. In a sense, this court has been asked to decide in this case whether the information required by the SEC is all that is "necessary, essential and sufficient" for a firm like Madison to value its investment. As Defendants point out, the publicly available information includes the cash flows of the partnerships, the debt levels, the occupancy level and locations of the properties and a wealth of additional information in the Partnerships' audited financial statements and Form 10–K and 10–Q filings. With the disclosure standards for the SEC being met in their public filings, Defendants argue that no additional information is necessary for Madison to value its investment.

Defendants allege that this is not only true in a universal sense, but as the facts of this case relate to Plaintiffs specifically. Indeed, the evidence shows that Madison has already valued its units, and continues to do so using a valuation model that requires only the public information already available. Both trial testimony and depositions confirmed that Madison is in the habit of using such a model and that these valuations are routinely the basis for the some 1,000 tender offers Madison has made for limited partnership units in the past, with some 700 such offers specifically made for real estate limited partnership units. Defendants argue that given this track record, the public information filed with the SEC should also be sufficient for Madison's purposes.

---

**32.** *Thomas & Betts Corp.,* 681 A.2d at 1031.

This court has held that the fact that a plaintiff has previously valued its interest in an entity should not in and of itself preclude its ability to seek additional information in its efforts to do so anew.[33] In addition, however complete and relevant the information required by the SEC, it is not surprising or disturbing that there may be information that is not covered by the public reporting regulations that, nonetheless, comes within the ambit of the a limited partner's statutory rights of review. Hence, neither of the Defendants' categorical objections to Madison's request are dispositive.

Passing to the specific objections, the court first notes that it has previously described the "necessary, essential and sufficient" standard as limiting records inspections to those documents shown to be reasonably required to satisfy the purpose of the demand.[34]

The court first concludes that the production of all limited partnership agreements between Real Estate Investment Partners and its subsidiaries *is* reasonably necessary to valuing Madison's investment in that partnership. At trial, Madison testified that the basis of its need for the limited partnership agreements with the subsidiary partnerships to determine the value of its shares is to ascertain the percentage of cash flows from the subsidiary partnerships the general partner is contractually entitled to receive. According to Madison's testimony, the general partner will often receive one percent of all cash flows generated by the subsidiary partnership. The terms of such agreements vary, however, and the percentage of cash flow that goes to the general part-

ner can be as high as ten percent. Moreover, it can be the case that the percentage due to the general partner changes at some point in time. For example, the percentage of the cash flow generated by the subsidiary that the general partner receives might be one percent up to a certain point in time and ten percent from that point forward. Because such a change would have a direct impact on the cash flows received by the entity in which Madison has invested, this information is reasonably necessary for it to value its investment.

Second, the court concludes that the production of all mortgage, loan, note and debt agreements for the Partnerships (and the Real Estate Investment Partners subsidiaries) *is not* reasonably necessary to value Madison's investment. This is because Madison's stated reason for requesting them presupposes that an event of liquidation will occur and that it is necessary for Madison to understand who will take what value when it does. While it is no doubt possible for Madison to forecast the likelihood that such a liquidation or liquidations will occur, and, using that probability, assign a value to the impact such an event would have on the units it holds, such information falls short of what is reasonably necessary for Madison to currently value its units.

Third, the court concludes the production of all non-public financial statements specifically relating to the real estate held or owned by the Partnerships *is not* necessary to value Madison's investment. Nevertheless, the court concludes that non-public financial statements

33. *See e.g. Thomas & Betts Corp.,* 685 A.2d at 714 (The fact that the entity in question in *Leviton* is private while the entities at issue in this case are *public* is not relevant to the scope of discovery analysis.).

34. *Carapico v. Philadelphia Stock Exch., Inc.,* 791 A.2d 787, 793 (Del.Ch.2000).

specifically relating to the subsidiary partnerships through which Real Estate Investment Partners invests *are* reasonably necessary to value Madison's investment in that partnership. According to trial testimony, the profits and loss information for the subsidiaries that hold much of the valuable property of Real Estate Investment Partners, as well as information relating to the level of debt on each property, is not included in the publicly available information concerning the Partnerships. The court accepts Madison's argument that the aggregated financial statements of the partnership as a whole mask the performance and value of the individual properties and can make it difficult to value the partnership as a whole. Accordingly, to the extent the books and records of Real Estate Investment Partners contain such information, they will be made available to Plaintiffs.[35]

## IV.

For the reasons discussed above, the relief sought is granted in part and denied in part. Counsel are directed to confer and submit an appropriate form of order by August 7, 2002.

---

35. The parties have not addressed the fact that Plaintiffs' right to inspect certain books and records of the Partnerships would not ordinarily entitle them to access to the books and records of the Partnerships' subsidiaries. *Arbor Place*, 2002 WL 205681 at *6. ("The separate existence and rights of discrete entities is well established in Delaware law and the Court is reluctant to ignore such separate existence even in the case of a wholly-owned subsidiary. The books and records of the [subs] are not the books and records of the LLCs."). For this reason, the court's final order will relate only to books and records of the Partnership, with the understanding that those books and records may well include information, including financial information, received from operating subsidiary entities.