IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SPENCER L. MURFEY, III as Co-Trustee for the Trust for the Benefit of Spencer L. Murfey, III, under the Power of Appointment Trust of Spencer L. Murfey, Jr., u/a/d August 1, 2002 and CYNTHIA H. MURFEY as Co-Trustee for the Trust for the Benefit of Cynthia H. Murfey, under the Power of Appointment Trust of Spencer L. Murfey, Jr., u/a/d August 1, 2002, | § § § § § § § § § § § § | No. 294, 2019<br><br>Court Below: Court of Chancery of the State of Delaware<br><br>C.A. No. 2018-0652 |
| Plaintiffs Below, Appellant, | § § § | |
| v. | § § | |
| WHC VENTURES, LLC, a Delaware limited liability company, WHC VENTURE 2009-1, L.P., a Delaware limited partnership, WHC VENTURES 2013, L.P., a Delaware limited partnership, and WHC VENTURES 2016, L.P., a Delaware limited partnership, | § § § § § § § § § | |
| Defendants Below, Appellee. | § § | |

Submitted: April 22, 2019
Decided: July 13, 2020

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices. Constituting the Court *en Banc*.

1

Upon appeal from the Court of Chancery of the State of Delaware. **REVERSED** and **REMANDED**.

Carl D. Neff, Esq. (*argued*), and E. Chaney Hall, Esq., Fox Rothschild LLP, Wilmington, Delaware, *Counsel for Appellant.*

John J. Tumilty, Esq. (*argued*), Morse, Barnes-Brown & Pendleton, PC, Waltham, Massachusetts; Raymond J. DiCamillo, Esq., and John M. O'Toole, Esq., Richards, Layton & Finger, P.A., Wilmington, Delaware, *Counsel for Appellee.*

**VALIHURA**, Justice for the Majority:

This case arises from a demand for books and records of certain limited partnerships by two of their limited partners. Most of the documents demanded have been produced, but one category of documents remains in dispute—the Schedule K-1s ("K-1s") attached to the partnerships' tax returns. Although the limited partners are provided with their own K-1s, the limited partners seek the K-1s of the other limited partners for the purpose of valuing their ownership stake in the partnerships and in order to investigate mismanagement and wrongdoing. The partnerships have countered that the K-1s are not necessary and essential to the valuation purpose and there is no credible basis to suspect wrongdoing. The Court of Chancery, based upon its history of interpreting 6 *Del. C.* § 17-305 in the same manner as 8 *Del. C.* § 220, held that the K-1s were subject to the requirement that documents sought be "necessary and essential" to the stated purpose, and it found that the K-1s failed that "necessary and essential" test.[1] Because we conclude that the limited partners are entitled to the sought-after documents under the terms of the partnership agreements, we reverse the Court of Chancery's decision and remand for proceedings consistent with this Opinion.

## I. Factual and Procedural Background

Defendant/Appellee WHC Ventures, LLC ("GP") is the general partner of multiple Delaware limited partnerships, including Defendants/Appellees WHC Venture 2009-1, L.P., WHC Ventures 2013, L.P., and WHC Ventures 2016, L.P. (collectively, the "Partnerships," and together with the GP, the "Appellees"). Peter Nordell, Jr. is the

---

[1] Opening Br. Ex. A at 21 [hereinafter *Tr. Ruling*].

3

managing member of the GP. Substantially all of the limited partners of the Partnerships are trusts for the benefit of members, or entities owned by or for the benefit of members, of either the Murfey or the Corning families. The families have been investing with Greylock Partners since 1965, and the Partnerships were formed for the purpose of investing in specific Greylock investments.

Plaintiffs/Appellants Trust for the Benefit of Spencer L. Murfey, III (the "Spencer Trust") and Trust for the Benefit of Cynthia H. Murfey (the "Cynthia Trust," and with the Spencer Trust, the "Trusts" or "Plaintiffs") are limited partners of the Partnerships. This action was filed on the Trusts' behalf by Spencer L. Murfey, III ("Spencer") and Cynthia H. Murfey ("Cynthia"), the beneficiaries of the Spencer Trust and Cynthia Trust, respectively. Homer Chisholm has served as trustee for the Trusts since 2007. Maria Muth served as co-trustee for the Trusts before Spencer and Cynthia replaced Muth as co-trustee for their respective trusts in 2015.

In 2011, the GP presented the limited partners of the Partnerships with two opportunities to increase their ownership stakes in WHC Venture 2009-1, L.P. ("WHC 2009"). Plaintiffs participated in only one of the opportunities. In 2011 and 2013, WHC 2009 admitted new limited partners. As a result of both the admission of new partners and the Plaintiffs' lack of participation in the second investment opportunity, Plaintiffs' ownership percentages in the Partnerships decreased.

On January 10, 2018, Spencer and Cynthia, on behalf of the Trusts, served a books-and-records demand on the Partnerships under 6 *Del. C.* § 17-305 and the Partnerships' respective partnership agreements (collectively, the "Partnership Agreements"), seeking to

4

inspect the records to value their interests in the Partnerships and to investigate wrongdoing and mismanagement related to the diminution of their ownership stake (the "Demand"). Among other documents, they requested "[c]opies of each Partnership's federal, state and local income tax or information returns and reports, if any, for the six most recent taxable years."[2]

The Partnerships responded to the Demand by pointing out that Plaintiffs lacked a proper purpose and sought information not related to the alleged purposes.[3] In the end, however, the Partnerships made available "all demanded documents" for inspection. In connection with the inspection, the Plaintiffs and the GP entered into a Confidentiality Agreement and Non-Disclosure Agreement Governing the Inspection of Books and Records (the "Confidentiality Agreement").[4] Spencer and Cynthia hired expert Richard Szekelyi of Phoenix Management Services to conduct the inspection.[5] On July 31, 2018, Szekelyi conducted an in-person inspection of certain of the partnerships' books and records at the office of the GP in Cleveland, Ohio.[6] During the inspection, the K-1s were made available to Szekelyi to review with Nordell, but Szekelyi was not permitted to make or retain copies of the Schedule K-1s.[7]

---

[2] App. to Opening Br. at A735 (Demand Letter).

[3] *Id.* at A742–A745 (Response to Demand Letter).

[4] *Id.* at A754–A761 (Confidentiality Agreement).

[5] Opening Br. at 11; Answering Br. at 10.

[6] *Tr. Ruling* at 10.

[7] *Id.*

Appellees subsequently agreed to make copies of the K-1s available to Szekelyi and to Plaintiffs' counsel on the condition that the K-1s would be produced under a "professionals' eyes-only" designation. Plaintiffs reserved their right to pursue greater access to the documents.

The parties' dispute culminated on September 4, 2018 when Plaintiffs filed a verified complaint. On November 19, 2018, Plaintiffs executed Amendment No. 1 to the Confidentiality Agreement.[8] This amendment allowed Plaintiffs' counsel and Szekelyi to obtain and possess copies of the K-1s on certain terms and conditions. Subsequently, Plaintiffs' counsel and Szekelyi executed undertakings in connection with Amendment No. 1 and received copies of the K-1s.

The Court of Chancery held a trial on February 6, 2019, and the parties filed a joint schedule of evidence on March 20, 2019. The court considered whether Plaintiffs could obtain copies of the K-1s, and whether Plaintiffs' advisors could consult with Plaintiffs concerning the information in the K-1s. The Court of Chancery issued a bench ruling on June 21, 2019. In short, despite the fact that Plaintiffs' advisers had been given copies of the K-1s, the Court of Chancery concluded that the Plaintiffs themselves "have no right to the K-1s or the information they contain."[9]

---

[8] *Id.* at 11; *see also* App. to Opening Br. at A762–A765 (Amendment No. 1 to Confidentiality Agreement).

[9] *Tr. Ruling* at 11.

6

At the heart of this appeal is whether Spencer and Cynthia may make copies of the K-1s and discuss their contents and information with their advisors.[10]  The court first set the framework for its statutory analysis as follows:

> In *Madison Avenue Investment Partners versus American First Real Estate Investment Partners*, this Court stated that a limited partner must meet three requirements to prevail on a books and records demand.[11]  The first two are laid out in Section 17-305(e).  The demand must follow the form and manner of making demand.  This is not an issue in this case.
>
> Next, the demand must be reasonable and for a purpose reasonably related to the limited partner's interest as a limited partner.  This requirement includes two components for the purposes the plaintiffs advance here.  The party requesting records must show the documents are "necessary and essential" to accomplishing that purpose.
>
> And to investigate potential wrongdoing, the party requesting the books and records must show "a credible basis from which the Court can infer that mismanagement, waste or wrongdoing may have occurred."  That's from *Seinfeld versus Verizon Communications.*
>
> These requirements are where all the action is in this case.
>
> Finally, the inspection right is subject to such reasonable standards "as may be set forth in the partnership agreement or otherwise established by the general partners."  That last part is a quote from Section 17-305(a).  This is also not an issue here because the parties provided no standards established by the general partner that pertain to the analysis here.[12]

---

[10] As the trial court stated, because "plaintiffs have already received other documents from defendants, and plaintiffs' CPA has reviewed the K-1s with Mr. Nordell," the "narrow issue before the Court is only whether the plaintiffs themselves may receive and keep copies of the K-1s." *Tr. Ruling* at 21.

[11] *See Madison Ave. Inv. P'rs, LLC v. Am. First Real Estate Inv. P'rs, L.P.*, 806 A.2d 165, 170–71 (Del. Ch. 2002).

[12] *Tr. Ruling* at 11–13.

The Court of Chancery determined that Plaintiffs had stated two purposes—namely, valuing their partnership interests, and investigating the propriety of the Plaintiffs' respective ownership interests in the Partnerships. Based upon the record, the court could not conclude that the Plaintiffs' "primary purpose is something other than valuing their shares or investigating the alleged wrongful dilution."[13] It held that, "[t]hose are proper purposes under our law."[14] The court then determined that Plaintiffs were left only with the valuation of the Trusts' ownership stakes, because it found that the Trusts "failed to demonstrate a credible basis to suspect wrongdoing in the admission of new limited partners," and that they "also failed to establish a credible basis for suspecting wrongdoing in the context of missing an opportunity to increase investments in the WHC 2009 partnership."[15]

The Court of Chancery also considered Plaintiffs' claim that they are entitled to the K-1s under the Partnership Agreements. The relevant sections are Sections 12.1 and 12.2,

---

[13] *Id.* at 14.

[14] *Id.*

[15] *Id.* at 15–16. Without asserting a cross-appeal, Appellees contend that the Court of Chancery abused its discretion in determining that Plaintiffs had stated a proper purpose in valuing their interests in the Partnerships. We find that challenge to be meritless both procedurally and substantively. Generally, in the corporate and alternative entity contexts, valuing the enterprise is a proper purpose. *Holman v. N.W. Broad., L.P.*, 2007 WL 1074770, at * 2 (Del. Ch. Mar. 29, 2007) (finding that valuation of interest is a proper purpose for a books and records demand); *Madison Ave. Inv. Pr's, LLC*, 806 A.2d at 174 ("Valuing one's investment is generally considered to be a proper purpose reasonably related to one's interest."); *see also Sanders v. Ohmite Hldg., LLC*, 17 A.3d 1186, 1193 (Del. Ch. 2011) (finding that, for Delaware limited liability companies, under 6 *Del. C.* § 18-305, valuation of one's ownership interests is a proper purpose for seeking books and records).

8

which are nearly identical in the three relevant Partnership Agreements.[16] Section 12.1 of

WHC 2009's partnership agreement provides:

ARTICLE XII
BOOKS AND RECORDS; ACCOUNTING; TAX ELECTIONS

***12.1  Books and Records****.  Books and records of the Partnership will be maintained at the principal office of the Partnership or at whatever other office of the Partnership as may be designated by the General Partner, and will be available for examination by any Partner or that Partner's duly authorized representatives at any reasonable time.  The Partnership will maintain the following books and records:*

> *12.1.1  A current list of the full name and last known business or residence address of each Partner, together with the Capital Contributions and Partnership Percentage of each of those Partners;*

> 12.1.2  A copy of the Certificate of Limited Partnership and all amendments thereto filed pursuant to **Section 1.2**, together with executed copies of any powers of attorney pursuant to which any certificate has been executed;

> *12.1.3  Copies of the Partnership's federal, state and local income tax or information returns and reports, if any, for the six most recent taxable years; and*

> 12.1.4  Copies of this Agreement and all amendments hereto.[17]

Section 12.2 provides, in relevant part:

***12.2  Inspection of Records.***

12.2.1 Each Limited Partner has the right, on any reasonable request, and subject to whatever reasonable standards as the General Partner may from time to time establish (including standards for determining whether the purpose for the request is reasonably related to the Limited Partner's Interest

---

[16] *Compare* App. to Opening Br. at A58 (WHC 2009 Partnership Agreement §§ 12.1, 12.2) *with id.* at A473–A474 (WHC Ventures 2013, L.P. Partnership Agreement §§ 12.1, 12.2) *and id.* at A624–A625 (WHC Ventures 2016, L.P. Partnership Agreement §§ 12.1, 12.2).

[17] *Id.* at A58 (emphasis added).

9

as a Limited Partner), to obtain from the General Partner for the purposes reasonably related to the Limited Partner's Interest as a Limited Partner the information set forth above in **Section 12.1** as well as information regarding the status of the business and financial condition of the Partnership (generally consisting of the Partnership's financial statements) and whatever other information regarding the affairs of the Partnership as is just and reasonable in light of the purpose related to the Limited Partner's Interest as a Limited Partner for which the information is sought. The General Partner may, however, keep confidential from any Limited Partner any information the disclosure of which the General Partner in good faith believes could be harmful to the business of the Partnership or is otherwise not in the best interests of the Partnership, or that the Partnership is required by law or agreement with a third party to keep confidential. Despite anything to the contrary in this Agreement or in the Act, Limited Partners will not be entitled to inspect or receive copies of the following:

(a) internal memoranda of any General Partner, whether relating to Partnership matters or any other matters;

(b) correspondence and memoranda of advice from attorneys or accountants for the Partnership or the General Partner; or

(c) trade secrets of the Partnership or the General Partner, investor information, financial statements of Limited Partners or similar materials, documents and correspondence.[18]

The court observed that the Court of Chancery "consistently has treated a contractual books and records right provided in a limited liability company's ("LLC") or a limited partnership's ("LP") governing instrument as independent from the relevant default statutory right."[19] It determined that Section 12.2.1 of the Partnership Agreements limits

---

[18] *Id.*

[19] *Tr. Ruling* at 23 (citing *Grand Acq., LLC v. Passco Indian Springs DST*, 145 A.3d 990, 994 (Del. Ch. 2016), *aff'd*, 158 A.3d 449 (Del. 2017)); *see also Bond Purchase, L.L.C. v. Patriot Tax Credit Prop., L.P.*, 746 A.2d 842, 852, 853 (Del. Ch. 1999) (holding that although the plaintiff did not have a right under 6 *Del. C.* §17-305(a) to a list of partners because the defendant's general partner had a good faith belief that disclosure was not in the best interests of the limited partnership, plaintiff did have a right to the list under the partnership agreement); *id.* at 853 (concluding that "this contractual right is in addition to and separate from the right to obtain information from the

a partner's right by requiring a proper purpose in the very same way 6 *Del. C.* § 17-305 does. The court then inserted a "necessary and essential" requirement into this contractual framework, stating that Section 12.2.1 of the agreements incorporates the necessary and essential requirement that has been applied in cases construing 6 *Del. C.* § 17-305. The court explained its ruling as follows:

> Plaintiffs have not argued that they have an unconditional contractual right to inspect the partnership's documents. What they have argued is that upon establishing a proper purpose, all of the books and records - - not some, but all - - identified in Section 12.1 must be provided to the limited partner.
>
> In other words, once they show a proper purpose, they do not need to show the requested books and records are necessary and essential to their purpose.
>
> But Section 12.2.1 permits each limited partner to obtain the information in Section 12.1 "for purposes reasonably related to the Limited Partner's Interest." The simple word "for" links the right to obtain the information in Section 12.1 to the limited partner's proper purpose in the very same way Section 17-305 does.
>
> The LLC agreement in *DFG Wine Co. versus Eight Estates Wine Holdings* used this same language, and the Court applied Section 18-305's "necessary and essential" language to consider whether the member was entitled to the documents sought among those the company was required to maintain.
>
> Plaintiffs cite no contrary case applying the proper purpose requirement without the "necessary and essential" element. Section 12.2.1 incorporates the proper purpose requirement from Section 17-305, thereby incorporating the derivative requirement that plaintiffs demonstrate the materials in Section 12.1 are necessary and essential to their valuation purpose.
>
> Plaintiffs' claims thus fail under the contractual provisions for the same reasons that they fail under Section 17-305.[20]

Partnership pursuant to Section 17-305"); Edward P. Welch et al., *Folk on The Delaware General Corporation Law, Vol. IV (Limited Liability Companies, Limited Partnerships)*, §17-305.02 at LP-3-75 (2020 ed.) ("As distinct from their statutory right under Section 17-305(a), limited partners may also have rights of access of partnership information under the partnership agreement.").

[20] *Tr. Ruling* at 24–25.

Plaintiffs then appealed. They raise the following issues on appeal: (1) that the requested information (the K-1s) need not be "necessary and essential" to their stated valuation purpose under 6 *Del. C.* § 17-305; (2) the Partnership Agreements do not contain a "necessary and essential" requirement, and thus, they are entitled to the documents under the Partnership Agreements; (3) that even if the K-1s must be "necessary and essential" to Plaintiffs' stated purpose, Plaintiffs have met that burden; (4) that the K-1s should not be redacted or designated as confidential if Plaintiffs are entitled to them; and (5) the emails between Muth, Chisholm, and the general partner of the GP, Peter Nordell, were inadmissible hearsay evidence.

Thus, on appeal, Plaintiffs continue to press for the K-1s via two different avenues. First, they seek them pursuant to 6 *Del. C.* § 17-305, which provides that limited partners may "obtain from the general partners from time to time upon reasonable demand for any purpose reasonably related to the limited partner's interest as a limited partner" five specifically identified categories of information and a sixth general category. The Court of Chancery has interpreted this language in the same way that it has interpreted 8 *Del. C.* § 220, holding that, like Section 220, Section 17-305 requires both a proper purpose and that the documents sought be necessary and essential to achieving that purpose.[21] In *Gotham Partners v. Hallwood*, the Court of Chancery explained that it believed this

---

[21] *See*, *e.g.*, *Madison Ave. Inv. P'rs, LLC*, 806 A.2d at 176 (identifying that for limited partnerships, inspection rights are "limited to those documents that are necessary, essential and sufficient for the shareholder's purpose" (quoting *Magid v. Acceptance Ins. Co., Inc.*, 2001 WL 1497177, at *3 n.10 (Del. Ch. Nov. 15, 2001) (internal quotation marks omitted))).

interpretation was logical because of the legislative history of Section 17-305, because Section 17-305 and Section 220 both provide for qualified rights, and because the language in the two statutes regarding the purpose requirement is similar.[22] However, Plaintiffs noted that, "[a]lthough the case law under 8 *Del. C.* § 220 contains a necessary and essential requirement, no Delaware Supreme Court case has applied this requirement in the alternative entity context."[23]

Plaintiffs contend that the Court of Chancery's application of a "necessary and essential" condition overlooks the structural differences between Section 17-305 and Section 220. For example, Section 17-305 provides a six-item list of document categories that limited partners may obtain from the limited partnership, and each item is set off in its

---

[22] *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 714 A.2d 96, 100–102 (Del. Ch. 1998); *see id.* at 102 ("I can conclude from [§ 17-305 and § 220's] overlap that § 220 case law embodies the most logical and meaningful source from which to seek precedent relevant to this dispute.").

[23] Opening Br. at 1–2.

own sub-section.[24]  Section 220's list is much shorter, containing only three items,[25] and

the list is contained in a single subsection.[26]  Of particular note is that the last item in the

Section 17-305 list contains a qualifier that Section 220's final item does not.  Although

---

[24] The Section 17-305 categories, as listed under subsection (a) of the statute, are:

> (1) True and full information regarding the status of the business and financial condition of the limited partnership;
>
> (2) Promptly after becoming available, a copy of the limited partnership's federal, state and local income tax returns for each year;
>
> (3) A current list of the name and last known business, residence or mailing address of each partner;
>
> (4) A copy of any written partnership agreement and certificate of limited partnership and all amendments thereto, together with executed copies of any written powers of attorney pursuant to which the partnership agreement and any certificate and all amendments thereto have been executed;
>
> (5) True and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each partner and which each partner has agreed to contribute in the future, and the date on which each became a partner; and
>
> (6) Other information regarding the affairs of the limited partnership as is just and reasonable.

6 *Del. C.* § 17-305(a).

[25] The § 220 list is contained in 8 *Del. C.* § 220(b)(1):  "The corporation's stock ledger, a list of its stockholders, and its other books and records . . . ."

[26] At oral argument, counsel for Plaintiffs argued that the first two items in the Section 220 list, *i.e.*, its stock ledger and list of stockholders, were not subject to the necessary and essential requirement.  *See* Oral Argument Video at 6:10–6:34, https://livestream.com/accounts/5969852/events/8915743/videos/199550105 ("The [necessary and essential] standard does not apply to the specifically mentioned documents under Section 220(b)(1), *i.e.*, the stock ledger or a list of the corporation's stockholders."); *see also* Reply Br. at 8.  But there are decisions of the Court of Chancery that apply the "necessary and essential" condition to these categories.  *See*, *e.g.*, *Bosse v. WorldWebDex Corp.*, 2009 WL 2425718, at *1 (Del. Ch. July 30, 2009) ("A list of stockholders, however, would not appear to be necessary or essential to making a valuation determination, so I can discern no basis at this point for ordering the company to produce a stockholder list."); *Cutlip v. CBA Int'l, Inc. I*, 1995 WL 694422, at *3 (Del. Ch. Oct. 27, 1995) (holding that, for plaintiff stockholders seeking to value their shares, consistent with the court's "obligation to tailor the access to books, records and stocklists to that reasonably necessary to effectuate the Plaintiffs' rights," stockholders are not entitled to the complete list of stockholders).

the final item of Section 220 simply provides for "other books and records,"[27] the final item of Section 17-305 provides for "[o]ther information regarding the affairs of the limited partnership *as is just and reasonable.*"[28]  Accordingly, Plaintiffs argue that the "necessary and essential" requirement ought to apply only to the catchall provision of Section 17-305(a)(6), and not to the specifically enumerated categories of documents listed in subsections (1)–(5).

We do not address the interesting statutory issues Plaintiffs raise regarding Section 17-305(a).  Instead, as further explained below, we hold that Plaintiffs are entitled to the K-1s under the Partnership Agreements.

## II.     *Analysis*

### A.  *Plaintiffs Have a Contractual Right to the K-1s*

As noted above, the Court of Chancery determined that Plaintiffs had stated a proper purpose, namely, valuing their respective ownership interests in the Partnerships.[29] Plaintiffs contend that under the Partnership Agreements, so long as their stated purpose is reasonably related to their interests as limited partners, they are entitled to inspect the K-1s, which fall within Section 12.1, and that the Partnership Agreements do not condition a limited partner's inspection rights on proving that the requested documents are "necessary and essential" to their stated purpose.  They say that the K-1s fall squarely within the scope

---

[27] 8 *Del. C.* § 220(b)(1).

[28] 6 *Del. C.* § 17-305(a)(6) (emphasis added).

[29] Plaintiffs assert that the court erred in determining that there was no credible basis as to the second purpose.  Because we hold that Plaintiffs are entitled to the K-1s on other grounds, we need not address this issue.

of Section 12.1 because (i) they are part of the partnership tax returns, and (ii) they contain the name, address, capital contributions, and partnership percentage of each limited partner. Thus, according to the Plaintiffs, "[u]nder the plain terms of the Partnership Agreement[s], [they] are entitled to obtain a copy of the K-1 Forms upon stating a proper purpose, subject to 'reasonable standards' the General Partner may establish."[30]

We agree and hold that Plaintiffs are entitled to the K-1s, which are part of the Partnerships' tax returns. The Court of Chancery denied Plaintiffs' request after implying a "necessary and essential" condition into the Partnership Agreements, holding that the "simple word 'for' links the right to obtain the information in Section 12.1 to the limited partner's proper purpose in the very same way Section 17-305 does," and thus, "Section 12.2.1 incorporates the proper purpose requirement from Section 17-305, thereby incorporating the derivative requirement that plaintiffs demonstrate the materials in Section 12.1 are necessary and essential to their valuation purpose."[31]

The preposition "for" does link, in a general way, the right to obtain certain information to the purpose, and in this way, the word "for" performs a certain limiting function.[32] Plaintiffs sought the tax returns (including the K-1s) for the purpose of

---

[30] Opening Br. at 23.

[31] *Tr. Ruling* at 25.

[32] A preposition is a "word that is used before a noun, a noun phrase, or a pronoun, connecting it to another word." *Preposition*, Cambridge Dictionary Online, https://dictionary.cambridge.org/us/dictionary/english/preposition (last visited June 9, 2020). The Oxford English Dictionary defines the preposition "for" as: "With a view to; with the object or purpose of: as preparatory to . . . ." *For*, Oxford English Dictionary (2d ed. 1989), *available at* Oxford English Dictionary Online (last visited June 9, 2020). Merriam-Webster defines "for" as: "used as a function word to indicate purpose," "an intended goal," and "the object or recipient of

16

conducting their valuation exercise, and the court correctly determined that purpose was reasonably related to their interest as a limited partner. But, as we explain, that is where our agreement with the Court of Chancery ends, as we decline to import a "necessary and essential" condition into the agreements. The words "necessary" and "essential" perform an even greater limiting role than does the word "for."[33] In this context, where the requested K-1s clearly fall within two of the enumerated subsections of Section 12.1, and where the GP has chosen not to subject the right to obtain the information in Section 12.1 to any standards that are relevant here, as the court found, we decline to imply such a condition in the agreement.[34]

---

a perception, desire, or activity . . . ." *For*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/for (last visited June 9, 2020).

[33] Merriam-Webster defines "necessary" as "absolutely needed," and "essential" as "of, relating to, or constituting," or "of the utmost importance." *Necessary*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/necessary (last visited June 9, 2020); *Essential*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/essential (last visited June 9, 2020). The Oxford English Dictionary defines "necessary" as "Indispensable, vital, essential; requisite," and "essential" as "That is such by essence, or in the absolute or highest sense." *Necessary*, Oxford English Dictionary (3d ed. 2003), *available at* Oxford English Dictionary Online (last visited June 9, 2020); *Essential*, Oxford English Dictionary (2d ed. 1989), *available at* Oxford English Dictionary Online (last visited June 9, 2020). The Court of Chancery has described the "'necessary, essential and sufficient' standard as limiting records inspections to those documents shown to be reasonably required to satisfy the purpose of the demand." *Madison Ave. Inv. P'rs, LLC*, 806 A.2d at 178.

[34] The trial court found that, "the parties provided no standards established by the general partner that pertain to the analysis here." *Tr. Ruling* at 13. Although the court made the finding in reference to its analysis under Section 17-305(a), Section 12.2.1 of the Partnership Agreements contains similar language. *See* App. to Opening Br. at A58 (providing in Section 12.2.1 that, "[e]ach Limited Partner has the right, on reasonable request *and subject to whatever reasonable standards as the General Partner may from time to time establish (including standards for determining whether the purpose for the request is reasonably related to the Limited Partner's Interest as a Limited Partner) to obtain . . .*" (emphasis added)).

17

The court's inferring a "necessary and essential" condition raises the issue of when it is appropriate for a court to infer contractual obligations in a limited partnership agreement. In *Schwartzberg v. CRITEF*,[35] Chancellor Allen shed light on this question when he considered whether an "improper purpose defense" could be inferred by the court in the context of a general partner's statutory and contractual rights to access a partnership's list of partners.

In *Schwartzberg*, the plaintiff was both a general partner and a limited partner of one defendant, and a limited partner of the other defendant. Both defendants were limited partnerships. The plaintiff sought limited partner financial information as well as lists of investors in subsidiary limited partnerships. In arguing for relief, the plaintiff asserted that he was entitled to the information under the partnership agreements, and statutorily in either his role as a general partner or his role as a limited partner.

In first summarizing its ruling against the plaintiff, the court found that the sole or predominant reason for plaintiff's request was to attempt to replace the limited partnerships as general partners of subsidiary partnerships, and to gain leverage over other partners with respect to litigation between them for plaintiff's "personal financial advantage and at considerable risk to the financial welfare of the Partnerships."[36] Because those purposes were "personal to the individual seeking access and they [were] adverse to the interests of

---

[35] 685 A.2d 365 (Del. Ch. 1996).

[36] *Id.* at 374.

the partnership considered jointly," they were improper purposes.[37] The court ultimately denied access on the basis of that implied defense.

In a footnote, the court observed at the start that 6 *Del. C.* § 17-305 makes clear that a limited partner must demonstrate a proper purpose in requesting such information. It stated that plaintiff failed to make that showing.[38] The court then focused its attention principally on the statutory inspection rights of a general partner, and the text of the partnership agreements. It observed that neither contained an express limitation on "purpose," and, thus, "*in each instance one must begin with the recognition that a [general] partner has no obligation to prove that it has a 'proper purpose' in order to enforce one of these rights to the prescribed access*."[39] The court, however, also noted that neither "expressly negate the notion that a defense of improper purpose is implied in the grants."[40] Thus, it proceeded to analyze whether access could be denied through an implied "improper purpose" defense.

Chancellor Allen began his analysis of that question by observing that, "[i]t is of course generally recognized that implicit obligations consistent with the text of written obligations may, indeed under correct conditions should be inferred under both statutes and

---

[37] *Id.* Here, the court noted "the absence of evidence showing an improper actual purpose." *Tr. Ruling* at 14.

[38] *Schwartzberg*, 685 A.2d at 375 n.14.

[39] *Id.* at 375 (emphasis in original).

[40] *Id.*

contracts."[41] But, he observed that, "[t]he conditions under which an implied contractual obligation may be inferred were narrowly construed by [the Court of Chancery] in *Katz v. Oak Industries, Inc.*"[42] Relying on *Katz*, he concluded that under Delaware law, an obligation may be inferred from a contract when, given the terms of the express contract made and the circumstance of the contracting process, it is more likely than not, that if the parties had thought to address the subject, they would have agreed to create the obligation that is under consideration by the court *ex post facto*.[43] He added that, "[w]hile this test requires resort to a counterfactual world—what if—it is nevertheless appropriately restrictive and commonsensical."[44]

Chancellor Allen then imagined individuals negotiating a partnership agreement with respect to access to information. He noted that all investors, whether limited partners or general partners, will start with a bias in favor of access. He recognized that, "[o]ngoing information will allow assessment of the investment and inform investment decisions— minimally buy, sell or hold decisions, but also perhaps voting or other choices open to the partner."[45] Although "cheap and ready access" might be an expected default rule, he noted that there could be costs in allowing such access, which could make it preferable by some

---

[41] *Id*. at 375–76 (citing *Skouras v. Admiralty Enter., Inc.*, 386 A.2d 674 (Del. Ch. 1978) (purpose adverse to corporation negates stockholders statutory right to access books)).

[42] *Id*. at 376 (citing *Katz v. Oak Indus., Inc.*, 508 A.2d 873 (Del. Ch. 1986) and *E.I. DuPont DeNemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del. 1996)).

[43] *Id.* Chancellor Allen observed that in *Katz*, the court actually used the phrase, "it is clear that," instead of the phrase, "more likely than not," but he stated, "that test is probably too high." *Id.*; *see also Bond Purchase*, 746 A.2d at 857 (reiterating the *Schwartzberg* test).

[44] *Schwartzberg*, 685 A.2d at 376.

[45] *Id*.

20

to limit access or condition it. He concluded that in one set of circumstances, however, it seemed "rather clear that all rational investors (looking at the matter *ex ante*) would elect to restrict access," namely, "when it is clearly established (by some reliable process) that the access will actually hurt the value of the joint investment."[46] He then concluded that, "there is little reason to suppose that they would not agree that access for an improper purpose should be restricted."[47] In so ruling, Chancellor Allen articulated the "improper purpose defense" by applying general contract principles regarding a court's ability to infer implicit obligations into a contract.

*In re Paine Webber Qualified Plan Property Fund Three, L.P. Litigation*[48] followed *Schwartzberg*. There, the Court of Chancery held that because plaintiff limited partners lacked a proper purpose, they had no statutory right under 6 *Del. C.* § 17-305 to the lists of limited partners they were seeking. However, four of the partnership agreements at issue did not explicitly condition plaintiffs' rights to the lists on the existence of a proper purpose. Applying Chancellor Allen's reasoning in *Schwartzberg*, then-Vice Chancellor Chandler began "with the recognition that plaintiffs are not required to demonstrate a proper purpose to enforce their contractual rights to the partnership lists because the partnership agreements of these four partnerships do not contain an express requirement concerning purpose."[49] The court then rejected defendants' contention that the proper purpose

---

[46] *Id.*

[47] *Id.*

[48] 698 A.2d 389 (Del. Ch. 1997).

[49] *Id.* at 392; *see also* Folk, *supra* note 19 at LP-3-75-76 (noting that, "[i]t has been held that the 'proper purpose' requirement of Section 17-305 does not 'trump' a partnership agreement that

21

requirement of Section 17-305 should be "read into" the partnership agreements, and it held that plaintiffs were entitled to limited partner lists for those partnerships.

Other more recent cases in the alternative entity context have followed that same logic. In *Grand Acquisition, LLC v. Passco Indian Springs DST*,[50] the Court of Chancery held that a beneficial owner of a statutory trust had a contractual right to inspect the trust's books and records independent of statutory preconditions and defenses, and that the owner's contractual right to inspect books and records included the right to inspect ownership records identifying other beneficial owners.

In that case, plaintiff, a beneficial owner of the Delaware statutory trust, Passco Indian Springs DST, made a demand on the trust for inspection and copies of the current list of the trust's beneficial owners, their contact information, and their respective ownership interests in the trust. The plaintiff contended that it was entitled to this information under both Section 5.3(c) of the trust's governing agreement and 12 *Del. C.* § 3819, the books and records provision of the Delaware Statutory Trust Act. The parties disputed whether the trust agreement incorporates the statutory requirements of 12 *Del. C.* § 3819, and if so, whether the beneficial owner had satisfied those requirements.

The Court of Chancery, in granting the beneficial owner's motion for summary judgment, first focused on "whether the Trust Agreement grants the Owners an

---

does not contain such a requirement," and that, "[a]s a result, a limited partner will not be required to demonstrate a proper purpose to enforce contractual rights to partnership information when the partnership agreement in question does not contain an express requirement concerning purpose").

[50] 145 A.3d 990.

independent books and records inspection right that does not incorporate any of the preconditions or defenses in Section 3819."[51] The court observed that Section 5.3(c) of the trust agreement expressly entitles the owners to "inspect, examine and copy the Trust's books and records," subject only to the condition that such inspection, examination, and copying be done "during normal business hours."[52] It then reasoned that, "[b]ecause Section 5.3(c) does not expressly include Section 3819's preconditions and defenses, the LLC- and LP- related case law suggests that the Trust Agreement grants the Owners an unconditional right to inspect [that trust's] books and records."[53]

The court then determined that the owners' right to books and records under the trust agreement included the requested information. Though the trust agreement did not define "books and records," it defined the term "Ownership Record" in Section 5.3(i) to include "the name, mailing address and Percentage Share of each Owner," which was the

---

[51] *Id*. at 996. The court also denied the trust's motion for summary judgment. The court expressly rejected the trust's contention that the governing trust instrument must expressly disclaim Section 3819's preconditions and defenses in order for them to be rendered inapplicable.

[52] *Id*.

[53] *Id*. (citing *Arbor Place, L.P. v. Encore Opportunity Fund, L.L.C.*, 2002 WL 205681, at *4 n.9 (Del. Ch. Jan. 29, 2002) ("Although the statute provides for a good faith defense to a statutory claim for production of books and records . . . this does not appear to be the proper standard to apply in response to a contractual claim to inspect books and records." (citation omitted)); *Bond Purchase*, 746 A.2d at 850–64 (applying the Delaware LP Act's proper purpose requirement and good faith defense to the statutory books and records right, but not to the contractual books and records right); *In re Paine Webber*, 698 A.2d at 392 ("[P]laintiffs are not required to demonstrate a proper purpose to enforce their contractual rights to the partnership lists because the partnership agreements of these four partnerships do not contain an express requirement concerning purpose."); and *In re Paine Webber Ltd. P'ships*, 1996 WL 535403, at *5–6 (Del. Ch. Sept. 17, 1996) ("*Schwartzberg* supports the proposition that this Court should *not* read § 17-305 into a partnership agreement that grants a limited partner access to partnership information without requiring a demonstration of proper purpose.")).

information sought.[54] Under Section 5.3(i), the trust manager was obligated to provide the trustee a copy of the Ownership Records promptly after each revision. The trust contended that because the defined term, Ownership Record, encompassed the requested information, and Section 5.3(c) did not list Ownership Records among the books and records the owners are entitled to inspect, the trust agreement intentionally excluded the requested information from the scope of the owners' contractual inspection right. The court disagreed and granted access. It observed that a Delaware statutory trust's customary "books and records" included the requested ownership information, as Section 3819 expressly includes a "current list of the name and last known business, residence or mailing address of each beneficial owner and trustee."[55] It further reasoned that, "[i]f [the trust] wished to bar access to the names and addresses of [Owners], it could have done so explicitly" in the trust agreement.[56]

Turning to the case at hand, and using Chancellor Allen's sound reasoning in *Schwartzberg* in this context, we consider whether it is more likely than not, that the parties, had they thought to address the subject, would have agreed to create the obligation of establishing that the specific tax return information sought must be "necessary and essential" to their stated purpose of valuing their investment (which all agree is a proper purpose).

Implying terms into a written contract should be a cautious enterprise. As this Court has repeatedly observed, parties in the alternative entity context have great freedom of

---

[54] *Id.* at 999.

[55] *Id.* at 1000 (quoting 12 *Del. C.* § 3819(a)(2)) (internal quotation marks omitted).

[56] *Id.* at 1000–01.

contract.[57]  As we recently said in *United States v. Sanofi-Aventis U.S. LLC*,[58] partnership agreements are a type of contract.  "We, therefore, construe them in accordance with their terms to give effect to the parties' intent."[59]  Further, "[t]he parties' intentions as reflected in the four corners of the agreement are given priority."[60]  Implying terms that the parties did not expressly include risks upsetting the economic balance of rights and obligations that the contracting parties bargained for in their agreement.[61]  Instead, as then Vice Chancellor Steele held in *Bond Purchase, L.L.C. v. Patriot Tax Credit Properties, L.P.*:

> it is not necessary for . . . partnership provisions to include explicit language that they are creating contractual rights separate and independent of statutory rights in order for those provisions to in fact create a separate and independent contractual right.  Rather, where a provision in a partnership agreement appears on its face to create a right separate and independent from a statutory right or a right granted in another section of the partnership

---

[57] *See Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 290 (Del. 1999) ("The policy of freedom of contract underlies both the [LLC] Act and the LP Act."); *U.S. v. Sanofi-Aventis U.S. LLC*, 226 A.3d 1117, 1128 (Del. 2020) (noting the Delaware Revised Uniform Partnership Act's policy "to give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements" (quoting 6 *Del. C.* § 15-103(d))).

[58] 226 A.3d 1117.

[59] *Id.* at 1129.

[60] *Id.* (quoting *GMG Capital Inv., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)) (internal quotation marks omitted).

[61] In *Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, for example, we noted that Delaware's implied covenant of good faith and fair dealing—best understood as a way of implying terms in the agreement when there are unanticipated developments or gaps to fill in the contract's provisions—is not a remedy for "rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract." 202 A.3d 482, 507 (Del. 2019) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010)) (internal quotation marks omitted).  Moreover, "where the contract is silent, an interpreting court cannot use an implied covenant to re-write the agreement between the parties, and should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it." *Id.* (quoting *Nationwide Emerging Managers, LLC v. Northpointe Hldgs., LLC*, 112 A.3d 878, 897 (Del. 2015)) (internal quotation marks omitted).  Though the parties do not invoke the implied covenant, the concerns regarding implying terms into a contract similarly apply.

agreement, the partnership agreement must explicitly state that the provision is merely clarifying or placing additional conditions on the other statutory or contractual right if in fact that is the provision's intended purpose. Otherwise, this Court will conclude that the parties intended the provision to create the separate and independent contractual right that the provision on its face purports to create.[62]

Where the parties here have disputed the inspection rights under separate statutory and agreement-based grounds, we cannot conclude, for several reasons, that such a condition should be implied in the agreements so as to preclude Plaintiffs' access to the K-1s. First, Section 12.2.1 of the Partnership Agreements entitles limited partners "to obtain from the General Partner for purposes reasonably related to the Limited Partner's Interest as a Limited Partner" the information set forth in Section 12.1.[63] The court correctly determined that valuing one's interest in the partnership is a purpose reasonably related to the Limited Partner's interest as a limited partner. Section 12.1 lists, as information limited partners are entitled to, "[a] current list of the full name and last known business or residence address of each Partner, together with the Capital Contributions and Partnership Percentage of each of those Partners" under subsection 12.1.1, and "[c]opies of the Partnership's federal, state and local income tax or information returns and reports, if any, for the six most recent taxable years" under subsection 12.1.3.[64] The specific identification of this tax return and capital contribution information highlights the importance of that particular information to investors, and the Partnerships' recognition of that importance.

---

[62] *Bond Purchase*, 746 A.2d at 855.

[63] App. to Opening Br. at A58, A473–A474, A625 (Partnership Agreements § 12.2.1).

[64] *Id.* at A58, A473, A624–A625 (Partnership Agreements §§ 12.1.1, 12.1.3).

The requested K-1s fall within the scope of Section 12.1.1 because they contain the name, address, capital contributions, and partnership percentages as listed in 12.1.1. They also fall within Section 12.1.3 since they are part of the Partnerships' tax returns,[65] which can provide important information for Plaintiffs' valuation purpose.[66]

---

[65] According to the 2018 Partner's Instructions for Schedule K-1 (Form 1065), "[t]he partnership files a copy of Schedule K-1 (Form 1065) with the IRS." *Id.* at A853 (2018 IRS, Dept. of the Treasury Partner's Instructions for Schedule K-1 (Form 1065)). Schedule K-1 is one of several forms and schedules that comprise the return, and thus, the K-1s should be viewed as a part of the Partnerships' tax returns under Section 12.1.3 of the Partnership Agreements. Appellees point to the IRS manual and note that it provides that although a limited partner is entitled to receive the partnership's tax returns, a limited partner is only entitled to obtain his or her own K-1, and not the K-1s of other limited partners. Internal Revenue Manuals § 11.3.2.4.2, *http:/www.irs.gov/irm/part11/irm_11-003-002* (updated May 13, 2020). The Partnership Agreements could have, but did not make this distinction. The legitimate concerns regarding sensitive personal identifying information (such as Social Security and EIN numbers) are addressed in subsection B of this Opinion.

[66] Tax returns can provide important information needed for valuation. *See The Marilyn Abrams Living Trust v. Pope Inv. LLC,* 2017 WL 1064647, at *5 (Del. Ch. March 21, 2017) (ruling that, "because the funds contain a high concentration of Level 3 assets, [*i.e.*, assets that can only be valued on unobservable inputs,] the Manager's internal valuation documents and income tax returns are plainly essential to value" the ownership interest (citing *Ravenswood Inv. Co., L.P. v. Winmill & Co. Inc.*, 2014 WL 2445776, at *3 (Del. Ch. May 30, 2014) (inspection of non-public financial statements reasonably necessary to value an investment in an entity) and *Madison Ave. Inv. P'rs, LLC*, 806 A.2d at 178–79 (same))), *aff'd*, 177 A.3d 69 (Del. 2017) (Table); *Bizzari v. Suburban Waste Servs., Inc.*, 2016 WL 4540292, at *7 (Del. Ch. Aug. 30, 2016) (finding that plaintiff's valuation purpose was proper, and holding that "tax returns and schedules thereto" were necessary and essential to valuing his interests); *Quantum Tech. P'rs IV, L.P. v. Ploom, Inc.*, 2014 WL 2156622, at *11 (Del. Ch. May 14, 2014) (finding that "the absence of certain key information from the financial statements makes the tax returns necessary to valuation and sale of the stock"); *Dobler v. Montgomery Cellular Hldg. Co., Inc.*, 2001 WL 1334182, at *8 (Del. Ch. Oct. 19, 2001) (stating that "[t]ax returns, and the information that they contain, can provide valuable insight into the corporation's affairs and, hence, can prove to be both useful and necessary in effectively valuing the minority shares," and that "inspection of these documents, filed with Federal and state authorities, is not burdensome"); *Thomas & Betts Corp. v. Leviton Mfg. Co., Inc.*, 685 A.2d 702, 714 (Del. Ch. 1995) (finding that the defendant company's federal tax returns for the prior three fiscal years are essential for its stockholder's valuation purpose), *aff'd*, 681 A.2d 1026 (Del. 1996).

27

Since the Partnership Agreements do not expressly condition the limited partner's inspection rights on satisfying a "necessary and essential" condition, and given the obvious importance of tax return and partnership capital contribution information to the Partnerships' investors, as evidenced by the agreements, we are not persuaded that such a condition should be implied. Further, the Partnerships should not be able to cull from the tax returns only that information which they deem "necessary and essential" to the Plaintiffs' valuation purpose when they have not set forth any standards that pertain to such inspection requests.[67]

Further, as a practical matter, Plaintiffs' expert, Mr. Szekelyi, has viewed the K-1s, and in Amendment No. 1 to the Confidentiality Agreement, Appellees agreed to allow Plaintiffs' counsel and Mr. Szekelyi to have copies of the K-1s. Plaintiffs' advisers should be able to discuss this information with them in order to properly advise them.

Moreover, we reject the Appellees' contention that this Court could affirm on the alternative ground that Section 12.2.1(c) provides a basis for the GP to prevent Plaintiffs from having access to the K-1s. In the proceedings below, the GP relied upon Section 12.2.1(c) to justify denying Plaintiffs access to the K-1s.[68] Section 12.2.1(c) provides that: "Despite anything to the contrary in this Agreement or in the Act, Limited Partners will

---

[67] Plaintiffs inspection right to items listed under Section 12.1 is not without limitation. Aside from stating a proper purpose, the right is "subject to whatever reasonable standards as the General Partner may from time to time establish." App. to Opening Br. at A58, A473–A474, A625 (Partnership Agreements § 12.2.1). As noted above, this limitation, however, is not relevant to the issues in this appeal because, as the Court of Chancery found, "the parties provided no standards established by the general partner that pertain to the analysis here." *Tr. Ruling* at 13.

[68] App. to Opening Br. at A1041–A1042 (Trial Tr.). Appellees also contended that the K-1s were not part of the Partnerships' tax returns. *Id.* at A1041. We disagree. *See supra* note 65.

28

not be entitled to inspect or receive copies of the following . . . (c) trade secrets of the Partnership or the General Partner, *investor information, financial statements of Limited Partners or similar materials, documents and correspondence.*"[69]

However, we think, reading the relevant sections of the Partnership Agreements together, that the K-1s are not the type of investor information that Section 12.2.1(c) captures. This is, in part, because Section 12.1.3 entitles a limited partner to tax returns, which include the K-1s. Further, Section 12.1.1 entitles a limited partner to "[a] current list of the full name and last known business or residence address of each Partner, together with the Capital Contributions and Partnership Percentage of each of those Partners."[70] It makes little sense to interpret Section 12.2.1(c) as restricting limited partners from inspecting or receiving copies of the very same information they are expressly allowed to examine under Sections 12.1.1 and 12.1.3. Instead, Section 12.2.1(c) is more fairly read to preclude limited partners from having access to the internal financial documents of another limited partner, *e.g.*, the "financial statements *of* Limited Partners or similar materials, documents and correspondence." K-1 forms are filed with the Partnerships' tax returns. Thus, we agree with Plaintiffs that Section 12.2.1(c) does not provide a reasonable basis for Appellees to deny access to the K-1s.

---

[69] App. to Opening Br. at A58, A474, A625 (Partnership Agreements § 12.2.1(c)) (emphasis added).

[70] *Id.* at A58, A473, A624 (Partnership Agreements § 12.1.1).

*B. Confidential Treatment of the K-1s*

Plaintiffs next contend that the Court of Chancery erred in determining that the K-1s and information derived therefrom were entitled to continued confidential treatment under Court of Chancery Rule 5.1. The Court of Chancery ruled that the K-1s would remain confidential pending a final ruling by this Court because allowing public access to the documents would essentially grant Plaintiffs the final relief they requested. Specifically, during the proceedings below, Appellees twice sought orders maintaining confidential treatment of certain information. In an April 24, 2019 order, the Court of Chancery denied the motions as to two categories, and granted the motion with respect to the K-1s. That order provided that:

> Defendants' Motion on the third category of information, including the identities and investment amounts of non-parties, is GRANTED, subject to a final ruling on Plaintiffs' request for books and records. The Schedule K-1s and the information they contain are at the heart of the parties' books and records dispute. Just as a party "cannot use the discovery process in a books and records case to gain access to the books and records ultimately at issue," it cannot use the fact that the documents at issue were considered in the books and records proceeding to effectively obtain those documents for their own use. Allowing public access to the K-1s would allow Plaintiffs access to those same documents, and would thereby moot the parties' dispute over whether Plaintiffs are entitled to the documents.[71]

Plaintiffs now request that this Court "enter an order lifting the confidentiality of the K-1s and information derived therefrom, except for social security numbers."[72]

---

[71] Opening Br. Ex. C at 5 (Order Regarding Confidential Treatment ¶ 4).

[72] Opening Br. at 37.

Court of Chancery Rule 5.1 identifies "[e]xamples of categories of information that may qualify as Confidential Information:" "trade secrets; sensitive proprietary information; sensitive financial, business, or personnel information; sensitive personal information such as medical records; and personally identifying information such as social security numbers, financial account numbers, and the names of minor children."[73] Consistent with this Opinion, Plaintiffs should be able to examine the K-1s, and because Appellees have already agreed to give copies of the K-1s to Plaintiffs' advisers, Plaintiffs are entitled to have copies as well. To the extent that the K-1s contain social security numbers (or partial social security numbers, *e.g.*, the last four digits) or tax identification numbers, the Partnerships may redact those numbers. Given that the K-1s contain sensitive personal information of the other limited partners, they should continue to be treated as "Confidential Information" within the meaning of Court of Chancery Rule 5.1.[74]

## C. Admissibility of Email Evidence

Finally, Plaintiffs contend that certain emails entered into evidence by the Partnerships were inadmissible hearsay. The emails, sent to Nordell from Homer Chisholm, reference a discussion between Maria Muth and Chisholm, the trustees of Plaintiffs at the time of the second investment opportunity, about whether to participate in that opportunity

---

[73] Ct. Ch. R. 5.1(b)(2).

[74] We note that in their Reply Brief, Plaintiffs state that, as they represented at trial, "they will accept a table reflecting the names and partnership percentages of each limited partner in lieu of the K-1s." Reply Br. at 10. This obviously would reduce the risk that any sensitive personal identifying information might be mishandled. We direct the parties to undertake measures, in any event, to reduce the risk of any personal sensitive identifying information (such as Social Security or tax EIN numbers) from inadvertently or otherwise being mishandled.

31

for the Trusts. As the Court of Chancery noted, these emails were relevant because "they relate to the supposed credible basis for suspecting wrongdoing."[75] But because we have concluded that Plaintiffs are entitled to the K-1s for the reasons stated above, the issues relating to the alternate proper purpose (*i.e.*, suspecting wrongdoing) are now moot for purposes of this books and records appeal.

*　*　*

Finally, we respond to our dissenting colleagues. Much of their dissent focuses on the first issue raised by Plaintiffs in this appeal, namely, whether a "necessary and essential" condition should be implied in Section 17-305(a)(1)–(5). This is a question we did not address because, among other reasons, we focused on the separate, independent contractual right of access in the partnership agreement.[76] The dissent assumes the answer to this question is "yes," even though this Court has not specifically addressed the circumstances under which it may be appropriate to import conditions applied in the Section 220 statutory scheme into the alternative entity statutory scheme, and, in particular, into subsections (1) through (5) of Section 17-305(a). Relying on a significant number of Court of Chancery cases that generally apply Section 220 in the alternative entity context, the dissenters then conclude that a partnership agreement that uses language similar to Section 17-305(a) must also "import" any such conditions into the partnership agreement.

---

[75] *Tr. Ruling* at 19.

[76] Indeed, their conclusion emphasizes that "Section 17-305(a) . . . does not provide for such access," and they oddly chide us by saying that "[a]ny change to this statutory inspection regime is . . . within the legislature's province, not ours." Dissent at 13.

They concede that "parties are free to contract around these limitations," but they say that parties must expressly disavow the "necessary and essential" condition they have assumed exists in Section 17-305(a)(1)–(5). Thus, their conclusion to the contract question depends upon a double set of assumptions, namely, that corporate law Section 220 conditions should be applied to subsections (1) through (5) of Section 17-305(a), and that use of any language in the contracts similar to that appearing in the Section 220 statutory scheme means that Section 220's judicially created conditions must be also imported into the contracts, even if it means adding new terms restricting expressly specified categories of information contained in the contracts.[77]

Leaving aside the interesting issue of incorporating Section 220 conditions into Section 17-305(a)(1)–(5), and even acknowledging a number of Court of Chancery cases have applied Section 220 case law in the Section 17-305 context, we think the dissent gets off-track by basing its analysis of the contract issue almost entirely on cases construing the statute, instead of focusing on the language of the agreements. They criticize the Majority for finding an "independent" right to inspection and for "interpret[ing] the agreement in isolation."[78] But it is well-established that "[a] contract's express terms provide the starting

---

[77] The first assumption in the dissent is: "Thus, according to our § 220 precedent, which, as noted, informs our interpretation of Section 17-305, the enumerated documents in Sections 17-305(a)(1)–(5) should also be subject to a 'necessary and essential' requirement." Dissent at 5–6. The second assumption is: "When parties draft contract language that tracks statutory language, their intent is almost certainly for the contractual provision to have the same effect as the statutory provision does." *Id.* at 7.

[78] *Id.* at 6.

point in approaching a contract dispute."[79]  And there is a long history of cases that hold that limited partners' rights of access under a partnership agreement and under the statutory scheme are distinct.  There is also a long-standing policy of respecting freedom of contract in the alternative entity context.[80]  Notwithstanding these principles, the dissent infers that the parties intended to adopt a term limiting the limited partners' access to the expressly enumerated categories of information in Section 12.1 based solely upon the similarity of certain phrases used in Section 12.1.2 to Section 17-305(a).  We see several problems with this inference.

First, it is axiomatic that courts cannot rewrite contracts or supply omitted provisions.[81]  Doing so does not respect the parties' freedom of contract.

Second, we do not think it is fair, or consistent with *Schwartzberg*, to infer that the parties intended to incorporate this condition based solely on the similarity in certain phraseology in the contract and Section 17-305(a) since the question of whether Section 220's conditions should be imported into Section 17-305(a)(1)-(5) is one of the very questions before us and is an issue of first impression.  Although the dissent believes the

---

[79] *inTeam Assoc., LLC v. Heartland Payment Sys., Inc.*, 2016 WL 5660282, at *14 (Del. Ch. Sept. 30, 2016), *aff'd in part, rev'd in part,* 171 A.3d 544 (Del. 2017); *see also Mrs. Fields Brand, Inc. v. Interbake Foods LLC,* 2017 WL 2729860, at *16 (Del. Ch. June 26, 2017) ("Under Delaware law, a 'contract's express terms provide the starting point in approaching a contract dispute.'") (citations omitted); *Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019) ("To determine what contractual parties intended, Delaware courts start with the text."); 1 Bradley V. Voss, *Voss on Delaware Contract Law*, § 3.04[2], at 3-23 to -24 (Lexis 2020).

[80] *Sanofi-Aventis U.S. LLC*, 226 A.3d at 1128; *Elf Atochem N. Am., Inc.*, 727 A.2d at 290; *see also Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 306 n.3 (Del. 2015).

[81] *Conner v. Phoenix Steel Corp.*, 249 A.2d 866, 868 (Del. 1969) ("It is . . . axiomatic that a court may not, in the guise of construing a contract, in effect rewrite it to supply an omission in its provisions.").

answer to this is clear, and they implicitly resolve it to reach their conclusion, the Majority does not agree that it is so clear.[82]

Aside from the fact that the assumptions upon which their conclusion is based are at best, uncertain, even the Delaware case they cite for this proposition recognizes that, "the court looks to the most objective indicia of [the parties'] intent: the words found in the written instrument.'"[83] The words "necessary and essential" indisputably do not appear in the written agreements. The lead case relied upon by the dissenters is a federal case from the United States Court of Appeals for the Fifth Circuit.[84] In that case, the federal court did not add a term to the partnership agreement like the dissenters wish to do here. Rather, that court relied upon the legislative history of the Texas Uniform Limited Partnership Act to reconcile conflicting clauses in the agreement.

---

[82] Nor do we agree with the dissenters that the Plaintiffs have conceded anything by saying that their partnership agreements "track Delaware law." Indeed, their heading on the page following that quote is, "Section 17-305 Does Not Contain a Necessary and Essential Standard." Opening Br. at 18.

[83] *Freeman Family LLC v. Park Ave. Landing LLC*, 2019 WL 1966808, *4 (Del. Ch. Apr. 30, 2019); *see also id.* ("Standing in the shoes of an objectively reasonable third-party observer, if the court finds that the terms and language of the agreement are unmistakably clear, then the court should look only to the words of the contract to determine its meaning and the parties' intent.") (citation and internal quotation marks omitted). In *Freeman*, the Court of Chancery looked to Section 145 case law construing the phrase, "by reason of," in determining whether a party was entitled to advancement under a limited liability company operating agreement. Here the dissenters would add a term to undercut other express provisions of the Partnership Agreements.

[84] Dissent at 7 (stating that, "when the contract lifts language from a statute, arguments relevant to interpretation of the statute are relevant to interpretation of the contract." (citing *Cunningham & Co. v. Consol. Realty Mgmt., Inc.*, 803 F.2d 840, 843 (5th Cir. 1986) (stating that, "[s]uch statutory arguments can be considered to fill in gaps in contracts")). Here, there are no "gaps." *See, e.g.*, *Oxbow*, 202 A.3d at 507 (declining to apply the implied covenant because "no gap exists," and stating that, "[e]ven where the contract is silent, an interpreting court cannot use an implied covenant to re-write the agreement between the parties" (citation, internal formatting and quotation marks omitted)).

Although drafters of partnership agreements and operating agreements may adopt concepts from the laws of other entities, any similarity in language used in those contracts to the corresponding statutory scheme does not suggest that courts should add new terms and conditions to the contract that simply do not exist within the four corners of the agreement, particularly where the parties could have easily drafted such terms and conditions. This is especially the case here where there is a dispute as to whether "Delaware law" requires such condition to be read into Section 17-305(a)(1)–(5), and where such an implied condition would limit the express right of access to the narrow, specified categories of documents that the parties identified in Section 12.1, namely, the names, addresses and capital contributions of the limited partners; the certificate of limited partnership; the partnership agreement; and tax returns. This already narrow and obviously carefully crafted list, more likely than not, represents what the parties, deemed to be the most basic and fundamental information an investor should have access to in order to value his or her investment or in connection with some other proper purpose. Thus, the dissent's position is neither supported by *Schwartzberg*, nor this court's general admonition in *Oxbow* where we cautioned that an interpreting court should be most chary about implying contractual terms when the contract could easily have been drafted to expressly provide for such terms, limitations or conditions. [85] Here, the plain words, given their ordinary

---

[85] It follows that we also do not agree that the parties to a limited partnership agreement have to expressly disclaim any conditions applied in the Section 220 context (or the Section 17-305 context, as the dissent assumes). *See Grand Acq., LLC*, 145 A.3d at 996–99 (expressly rejecting the trust's contention that the governing trust instrument must expressly disclaim Section 3819's preconditions and defense in order for them to be rendered inapplicable.).

36

meaning, of the contract control—not unwritten, implied conditions that could have, but were not included.[86]

### III. *Conclusion*

For the foregoing reasons, we **REVERSE** the Court of Chancery's decision below and **REMAND** for proceedings consistent with this Opinion.

---

[86] *See Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992) ("Clear and unambiguous language . . . should be given its ordinary and usual meaning." (citation omitted)).

**TRAYNOR, Justice**, dissenting, with **MONTGOMERY-REEVES, Justice**, joining:

The Majority interprets the Partnership Agreements to have expanded the scope of limited partners' books-and-records inspections beyond what is permitted under Section 17-305(a). Instead of an inspection right limited to "necessary and essential" documents, the Majority's Opinion finds an independent and largely unconditional right to inspection in the Partnership Agreements. But the effect of this interpretation is to recognize a broader reach in the contractual language than we would permit under the statute from which that language was lifted. That, it seems to us, is contrary to the intentions of the parties as well as Plaintiffs' contentions on appeal. We therefore respectfully dissent.

## I. Analysis

A. *The text of Section 12.2.1 of the 2009 WHC Partnership Agreement tracks Section 17-305 and thus provides for an inspection right of the same scope as the statutory right.*

Section 12.2.1 of WHC 2009's partnership agreement [87] provides that "[each Limited Partner has the right, . . . subject to whatever reasonable standards as the General Partner may from time to time establish . . ., to obtain from the General Partner *for the purposes reasonably related to the Limited Partner's Interest as a Limited Partner*," an enumerated list of documents set forth in Section 12.1.[88] The books-and-records statute for limited partnerships, 6 *Del. C.* § 17-305, provides that "[e]ach limited partner . . . has

---

[87] Although there are several agreements in play, the parties agree that the language is, for all intents and purposes, similar enough that the 2009 WHC partnership agreement serves as an adequate model.

[88] Emphasis added.

the right, subject to such reasonable standards . . . as may be . . . established by the general partners, to obtain from time to time upon reasonable demand *for any purpose reasonably related to the limited partner's interest as a limited partner*,"[89] an enumerated list of documents.

It is readily apparent, and conceded by Plaintiffs, that the emphasized text of the partnership agreement "tracks Section 17-305, hence the discussion about the particular statute."[90] Plaintiffs do not argue that Section 17-305 does not include a "necessary and essential" component. Nor do they argue that Section 12.2.1 of the partnership agreement should be construed differently than Section 17-305. Rather, they argue—more by assertion than demonstration[91]—that the "necessary and essential" requirement of Section 17-305 is cabined to the open-ended category of "other information" provided for in Section 17-305(a)(6) and does not apply to the documents enumerated in Sections 17-

---

[89] Emphasis added.

[90] Oral Argument Video at 5:11–5:22, https://livestream.com/accounts/5969852/events/8915743/videos/199550105; Opening Br. at 17.

[91] Plaintiffs make two arguments regarding Section 17-305. First, they argue that Section 220 and Section 17-305 are structurally different, such that the "necessary and essential" requirement of Section 220 cases is unnecessary for Section 17-305. They point out that Section 17-305(a) includes a list of five specific categories of documents as well as a catch-all that includes the qualifier "other information . . . *as is just and reasonable.*" 6 *Del. C.* § 17-305(a)(6) (emphasis added). In contrast, Plaintiffs argue, Section 220(b)(1) contains a list of only 2 specific categories of documents, as well as a catch all with no qualifier. Plaintiffs do not explain, however, why the length of the list or the existence of the qualifier on the catch-all, should affect whether the documents sought must be related to the purpose for which those documents are sought. Second, Plaintiffs asserted at oral argument that, even if Section 17-305 is construed like Section 220, the "necessary and essential" requirement of Section 220 applies only to the catch all "other books and records"—and not to the two other items listed in Section 220(b)(1). For reasons explained below, we find this argument unpersuasive.

305(a)(1)–(5).[92]  Thus, according to Plaintiffs, because Section 12.2.1 tracks the language of Section 17-305, and because the K-1s fall within an enumerated category of documents in Section 12.1 and are not "other information," the "necessary and essential" requirement also does not apply.  We find this argument unpersuasive.

First, Section 17-305 does not provide for Plaintiffs' proposed disparate treatment of the subsections of Section 17-305(a).  To the contrary, Section 17-305(e) provides that "When a limited partner seeks to obtain the information *described in subsection (a)* of this section, the limited partner *shall* first establish: . . . that the information the limited partner seeks is reasonably related to the limited partner's interest as a limited partner."[93]  The statute does not refer to subsection (a)(6); rather, it subjects the entirety of the subsection (a) to the requirement that sought documents have some relationship to the proposed purpose.

As to the nature of that relationship, we agree with the Vice Chancellor—and Plaintiffs do not contest—that it is appropriate to interpret Section 17-305 with reference to 8 *Del. C.* § 220.[94]  This conclusion is supported by both the language of Section 17-

---

[92] *See* Majority's Opinion at 14 n.24.

[93] Emphasis added.

[94] Indeed, the Court of Chancery has used case law interpreting Section 220 as a guide for interpreting Section 17-305 for over two decades.  *E.g.*, *In re Paine Webber Ltd. Partnerships*, 1996 WL 535403, at *4 (Del. Ch. Sept. 17, 1996).  Accordingly, of the twenty Court of Chancery cases interpreting Section 17-305, half also cite Section 220, starting from 1996, with the most recent being within a month's time from the publication of this opinion.  *See Martinez v. GPB Capital Holdings, LLC*, 2020 WL 3054001 (Del. Ch. June 9, 2020).  Twenty-seven Court of Chancery cases cite to Section 17-305, but only twenty of those cases interpret Section 17-305 itself (the remaining cases tend to use Section 17-305 to interpret other statutes or to resolve books-and-records disputes for other alternative entities, such as LLCs or statutory trusts).  Of these twenty cases, ten cite Section 220 and refer to its case law to interpret how to apply Section 17-

305—which tracks the language of Section 220 regarding the requirements for books-and-records demands[95]—and from the Court of Chancery's existing Section 17-305 case law.[96] Section 220 contains a longstanding "necessary and essential" requirement that applies, contrary to Plaintiffs' representations,[97] to both the enumerated documents—"the corporations stock ledger [and] a list of its stockholders"[98]—and to the "other books and

---

305. In fact, of the cases interpreting Section 17-305 and also citing Section 220, none fail to mention that Section 220 is used to interpret Section 17-305. Notably, this count does not include the opinion below here, which would bring the tally up to more than half: eleven of twenty-one. The practice of using Section 220 jurisprudence to interpret Section17-305 has become so widely accepted that limited partnership treatises treat the "necessary and essential" case law from Section 220 as applicable to Section 17-305. ROBERT S. SAUNDERS, ET AL., FOLK ON THE DELAWARE GENERAL CORPORATION LAW Section 17-305.02 at LP-3-71–LP-3-72 (6th ed. 2019) ("[E]ven where a limited partner's purpose is proper, the scope of an inspection provided by the statute will typically be limited to the inspection of those books and records that are necessary and essential to the satisfaction of the stated purpose") (internal quotation marks omitted).

[95] Section 17-305 allows limited partners to obtain certain books and records "for any purpose reasonably related" to such person's interest as a limited partner. While "any purpose reasonably related" is a very broad and vague term, it is the same language used to define the purpose requirement to obtain books and records under Section 220. Specifically, Section 220 provides stockholders "the right . . . to inspect for any proper purpose," where "proper purpose" is defined as "a purpose reasonably related" to such person's interest as a stockholder. Thus, the statutory language of Sections 17-305 and 220 provide for the *same* requirement in order to demand books and records.

[96] *E.g. Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 714 A.2d 96, 100–102 (Del. Ch. 1998); *see id.* at 102 ("I can conclude from [Section 17-305 and Section 220's] overlap that Section 220 case law embodies the most logical and meaningful source from which to seek precedent relevant to this dispute.").

[97] Oral Argument Video at 6:10 – 6:34, https://courts.delaware.gov/supreme/oralarguments/download.aspx?id=3304.

[98] *E.g. Cutlip v. CBA Intern., Inc. I*, 1995 WL 694422 (Del. Ch. Oct. 27, 1995) (holding that a stockholder who had been cashed out, and who argued that stockholders were *selectively* cashed out, was only entitled to a list of stockholders who had affirmatively consented to the merger—and not to a comprehensive list of stockholders); *Bosse v. WorldWebDex Corp.*, 2009 WL 2425718 at *1 (Del. Ch. July 31, 2009) ("A list of stockholders, however, would not appear to be necessary or essential to making a valuation determination, so I can discern no basis at this point for ordering the company to produce a stockholder list.").

records." And that "necessary and essential" requirement has been applied in the Section 17-305 context by the Court of Chancery on multiple occasions.[99] Thus, according to our Section 220 precedent, which, as noted, informs our interpretation of Section 17-305, the enumerated documents in Sections 17-305(a)(1)–(5) should also be subject to a "necessary

---

[99] *In re Plains All Am. Pipeline, L.P.*, 2017 WL 6016570, at *4 (Del. Ch. Aug. 8, 2017) ("In determining the proper scope of a books and records demand on a limited partnership, the Delaware Court of Chancery has relied on case law applying 8 *Del. C.* § 220, the corporate analog to Section 17–305. As such, Plaintiffs' [i]nspection rights are limited to those documents that are necessary, essential and sufficient for the shareholder's purpose." (internal quotation marks omitted)); *Holman v. Nw. Broad., L.P.*, 2007 WL 1074770, at *2 (Del. Ch. Mar. 29, 2007) ("In determining whether a specific purpose is "reasonably related to the limited partner's interest" under 6 *Del. C.* § 17-305, this Court has sought guidance from the case law considering a 'proper purpose' under 8 *Del. C.* § 220, the Delaware General Corporation Law's analogue to Section 17-305. Even if the applicable technical requirements are met and Holman's purpose is proper, '[t]he scope of such relief will typically be limited only to the inspection of those books and records that are necessary and essential to the satisfaction of the stated purpose.'" (quoting *Highland Select Equity Fund, L.P. v. Motient Corp.*, 906 A.2d 156, 164 (Del. Ch.2006))); *Madison Ave. Inv. Partners, LLC v. Am. First Real Estate Inv. Partners, L.P.*, 806 A.2d 165, 176 (Del. Ch. 2002) ("Inspection rights [in Section 17-305 cases] are 'limited to those documents that are necessary, essential and sufficient for the shareholder's purpose.'" (quoting *Magid v. Acceptance Ins. Companies, Inc.*, 2001 WL 1497177, at *3 (Del. Ch. Nov. 15, 2001), a case involving Section 220))).

42

and essential" requirement.[100]  Plaintiffs would therefore have to demonstrate that the K-1s are necessary and essential[101] to their stated purpose—valuing their stake.[102]

Instead of addressing the statute, the Majority interprets the agreement in isolation, concluding that the language of the agreement does not explicitly require a "necessary and essential" finding and that the Court of Chancery erred in inferring the existence of that requirement in the contract.  We disagree with this interpretation because it ignores the acknowledgement of both Plaintiffs and Defendants that the partnership agreement's text "tracks Section 17-305 . . . ."[103] and treats the near identical text of the contract and the statutes differently.  "Where the relevant contractual language is identical, [this] Court and sound public policy instruct trial courts to interpret such language consistently from case

---

[100] We note also that Delaware's Revised Uniform Limited Partnership Act ("DRULPA") was adopted from the Revised Uniform Limited Partnership Act ("RULPA").  RULPA originally contained an absolute and unqualified right to inspect books and records.  But that absolute right became a conditional one in 1985, "when Delaware broke ranks with its sister RULPA states and expressly qualified the limited partner's right to inspection by requiring that the limited partner's demand be 'reasonably related' to the limited partner's interest in the limited partnership." *Gotham Partners*, 714 A.2d at 101.

[101] We agree with the Court of Chancery's finding that Plaintiffs failed to demonstrate that the K-1s are necessary and essential to their stated purpose.  As the court pointed out, there is "no type of information on the K-1s that would help the plaintiffs value their investments.  [We] do not see how the percentages [owned by] the other limited partners, with identifiers, are necessary and essential to value [P]laintiffs' investments."  Trial Transcript, Ex. A to Opening Br. at 21.

[102] Plaintiffs appealed the Court of Chancery's finding that their purpose of investigating wrongdoing was not supported by a credible basis.  Even though the credible-basis standard is "incredibly low," as the Court of Chancery recognized, we agree with the court's finding that there was no credible basis to investigate wrongdoing because "the record contains an unrebutted admission by [P]laintiffs' then-trustees that they knew about the offer and decided against it.  The record does not establish any basis for suspecting wrongdoing within the partnership in the form of improper admission of new partners, not maintaining equal participation, or in not being informed of the opportunity to invest."  *Id.* at 20.

[103] Oral Argument Video at 5:11–5:22, https://livestream.com/accounts/5969852/events/8915743/videos/199550105.

to case."[104]  And when the contract lifts language from a statute, arguments relevant to interpretation of the statute are relevant to interpretation of the contract.[105]

Nor does the Majority's disparate treatment of nearly identical language, in our opinion, give effect to the parties' intentions.  When parties draft contract language that tracks statutory language, their intent is almost certainly for the contractual provision to have the same effect as the statutory provision does.[106]  This is true not only because imitating statutory language is a clear signal to the courts that a guideline for interpretation of the contract already exists—the statute—but also because contracts and statutes are interpreted in the same way.[107]  Having already interpreted statutory language according to the same canons of construction that apply to contracts, it follows that identical contractual language should be interpreted to have the same meaning.[108]

---

[104] *In re Encore Energy Partners LP Unitholder Litig.*, 2012 WL 3792997, at *9 (Del. Ch. Aug. 31, 2012) (citing *RAA Mgmt., LLC v. Savage Sports Hldgs., Inc.*, 45 A.3d 107, 119 (Del.2012) ("The efficient operation of capital markets is dependent upon the uniform interpretation and application of the same language in contracts or other documents.").

[105] *See, e.g.*, *Cunningham & Co. v. Consol. Realty Mgmt., Inc.*, 803 F.2d 840, 843 (5th Cir. 1986) (allowing "arguments based on the legislative history," and noting that "[s]uch statutory arguments [could] be considered to fill in gaps in contracts" because "it appear[ed] from the record that the parties lifted language from the statute without discussion.").

[106] *Freeman Family LLC v. Park Avenue Landing LLC*, 2019 WL 1966808, at *5 ("[T]he parties chose to use language that is nearly identical to the corporate statute.  The logical conclusion for why they did that is to import a predictable and well-defined rule from corporate statutory and case law.").

[107] *Calderon v. Atlas S.S. Co.*, 170 U.S. 272, 280 (1898) ("[I]n cases of ambiguity in contracts, *as well as in statutes*, courts will lean towards the presumed intention of the parties or the legislature, and will so construe such contract or statute as to effectuate such intention; but where the language is clear and explicit there is no call for construction, and this principle does not apply." (emphasis added)).

[108] Our friends in the Majority take us to task for assuming that a "necessary and essential" condition should be implied in Sections 17-305 (a)(1)–(5) and employing that assumption to rewrite the provision in the Partnership Agreement that tracks the statute.  We respectfully disagree

We are also not persuaded that the Court of Chancery opinions cited by the Majority support its conclusion. In *Schwartzberg v. CRITEF Assocs. Ltd. P'ship*,[109] Chancellor Allen applied *Katz v. Oak Industries, Inc.*,[110] concluding that "an obligation may be inferred when, given the terms of the express contract . . . and the circumstances of the contracting process, it is more likely than not . . . that if the parties had thought to address the subject, they would have agreed to create the obligation that is under consideration by the court *ex post facto*."[111] Here, given that it is undisputed that the language of the 2009 WHC Partnership Agreement "tracks Section 17-305"[112] and "Delaware law regarding a limited partner's entitlement to books and records,"[113] it follows that the parties expected the Partnership Agreement to have the same effect as Delaware law regarding limited partner books-and-records inspections at the time of contracting. And since the Court of

---

with the characterization of our premise as an "assumption;" we have at least tried to support it by both citing Court of Chancery case law with which we happen to agree and considering DRULPA's legislative history as an adjusted adoption of RULPA. *See* n.99 *supra*. And we stand by our consultation of the extant judicial interpretation of Section 17-305 as of the date that the Partnership Agreement was executed to support our interpretation of the relevant sections of that Agreement. It seems unremarkable to us that when one is interpreting contractual language that is inarguably patterned after a statute covering the same subject matter, one should take into account the prevailing interpretation of that statute. In this instance, the prevailing interpretation of the pertinent statute is found, in our view, in the line of Court of Chancery opinions that use case law interpreting Section 220 as a guide for interpreting Section 17-305. And, as we have noted, the Court of Chancery's reliance on Section 220 jurisprudence has led it to apply the "necessary and essential" requirement to Section 17-305 inspections on multiple occasions. Hence we believe that the parties intended it to apply to inspections under 12.2.1.

[109] 685 A.2d 365 (Del. Ch. 1996).

[110] 508 A.2d 873 (Del. Ch.1986).

[111] *Schwartzberg*, 685 A.2d at 376.

[112] Oral Argument Video at 5:11–5:22, https://livestream.com/accounts/5969852/events/8915743/videos/199550105.

[113] Opening Br. at 17.

Chancery has consistently referred to 8 *Del. C.* § 220 to interpret 6 *Del. C.* § 17-305 for over two decades, and Section 220 inspections include an implicit "necessary and essential" component, it also follows that the parties likely expected the Partnership Agreement to include that component. Had they thought otherwise, it is more likely than not that they would have explicitly disavowed the "necessary and essential" requirement that is implicit in the statute to which they were hewing so closely.

We also find *In re Paine Webber Qualified Plan Property Fund Three, L.P. Litigation*[114] inapplicable. Notably, the partnership agreement in *Paine Webber* did not track the statutory text at all. The agreement provided that "[a]ny partner . . . shall be entitled to a copy of the list of the names and addresses of the Limited Partners"[115]—an unconditional and unqualified inspection right, whereas the statutory right requires a proper purpose. The court contrasted the contractual language with the statutory language and decided that the purposeful omission of the purpose requirement meant that the contract created a separate inspection right from the statutory inspection right. That is not the case here, where neither party disputes that the contractual provision tracks the statutory provision.

We recognize that both *Grand Acquisition, LLC v. Passco Indian Springs DST*[116] and *Bond Purchase, L.L.C. v. Patriot Tax Credit Properties, L.P.*[117] discuss the fact that

---

[114] 698 A.2d 389 (Del. Ch. 1997).

[115] *Id.* at 391.

[116] 145 A.3d 990 (Del. Ch. 2016).

[117] 746 A.2d 842 (Del. Ch. 199).

partnership agreements can create separate and independent contractual rights for their stakeholders. But we understand "independent" and "separate" to mean that the right does not depend on the statute for its existence—they do not mean that the right necessarily is different than the statutory one in scope and application, especially when, as here, the plaintiffs have conceded that the contractual right "tracks" the statutory right. The Majority also points out that the agreement in *Grand Acquisition* did not expressly include the relevant statute's "preconditions and defenses."[118] But this is subject to the same point that we made above in our discussion about *Paine Webber*—the drafters of the language in that agreement did not track the statute's language and purposefully omitted text and conditions that were explicit in the statute. Here, the contractual language tracks the statute and, according to the Plaintiffs themselves, "Delaware law."[119] Both the similar language and the Plaintiffs' concession lead us to conclude that the contract meant to include the deeply embedded judicial gloss on the statute's language.

> B. *Under the 2009 WHC Partnership Agreement, there must be a relationship between the stated purpose and the documents subject to inspection.*

Even when read in isolation, the 2009 WHC partnership agreement does not lend itself to a reading under which the scope of inspection bears no relationship to the stated purpose. Section 12.1 requires the partnership to maintain certain documents so that they

---

[118] Majority Opinion at 23.

[119] Opening Br. at 17. The Majority makes light of Plaintiffs' acknowledgement that their partnership agreements "track Delaware law regarding a limited partner's entitlement to books and records." *Id.* But we view this statement, especially when coupled with the separate admission that Section 12.2.1's text "tracks Section 17-305," *see* n.102, *supra*, as lending support to our position that Section 12.2.1 should be interpreted consistently with how we would interpret Section 17-305.

47

"*will be available* for examination . . . at any reasonable time."[120] Section 12.2.1 provides limited partners with an inspection right that allows limited partners "to obtain . . . for the purposes reasonably related to the Limited Partner's Interest as a Limited Partner the information set forth above in Section 12.1."[121]

The Majority notes—and we agree—that the K-1 forms fall squarely within the categories of documents listed in Section 12.1 and that the GP has not established any relevant standard for inspecting those document as permitted under Section 12.2.1. But the GP's failure to establish standards does not, in our view, mean—as Plaintiffs argued and the Majority appears to accept—that the limited partners have an unconditional right to inspect *all* of the documents listed in Section 12.1 upon their identification of *any* proper purpose. That would be inconsistent with Section 12.2.1's requirement that the inspection be "for purposes reasonably related to the LP's Interest as a Limited Partner," which, as we understand Section 12.2.1's syntax, are the same "Interest" and "purposes" justifying the inspection in the first place. Indeed, to eliminate the requirement of a relationship between the purpose and the documents—as the Plaintiffs do[122]—would be to read the word "for" out of the provision.

---

[120] App. to Opening Br. at A58 (emphasis added).

[121] *Id.*

[122] Opening Br. at 22 ("Under the Partnership Agreement and Section 17-305, once a proper purpose is established, the documents identified in Section 12.1 must be disclosed to a limited partner."). But we do not see why a limited partner seeking, for example, to investigate wrongdoing by a general partner in the form of sexual harassment in the workplace would support a right to see the cash contributions of other partners.

48

Rather than granting an unconditional inspection right, Section 12.2.1, as we read it, explicitly ties inspection rights to the purpose the limited partner has identified as motivating its inspection demand. Not only that, but the linkage of the contractual inspection right to the purpose of the inspection is expressed in terms that are, practically speaking, identical to the relevant portion of Section 17-305(a). Indeed, the Plaintiffs conceded that their contractual inspection right was co-extensive with their statutory inspection right.[123]

### C. The email evidence was admissible.

Because we conclude that Plaintiffs are not entitled to the K-1s, we address the admissibility of email evidence—an issue that the Majority, because it reversed on other grounds, did not need to address. The emails were sent to Nordell from Homer Chisholm and reference a discussion between Maria Muth and Chisholm, the trustees of the Trusts at the time of the second investment opportunity, about whether to participate in that opportunity for the Trusts. These emails were not hearsay because they were not offered to prove the truth of the matter asserted—i.e., that the trustees rejected the investment opportunity. Instead, the emails were offered only to show that the trustees received notice of the investment opportunities. And even if the emails were considered hearsay—which they are not—they would be subject to the exception to admissibility provided in D.R.E.

---

[123] Opening Br. at 17 ("The Partnership Agreements track Delaware law regarding a limited partner's entitlement to books and records.").

801(d)(2)(D) because they are statements of a party opponent's agent offered against that party opponent.[124]

## II.    *Conclusion*

We do not dispute that there might be sound reasons for allowing limited partners, either by contract or by statute, unconditional access to certain partnership documents, including the partnership's tax returns with all their schedules and attachments, subject, of course, to confidentiality restrictions. But Section 17-305(a) as currently worded and as historically interpreted by the Court of Chancery does not provide for such access; the statute requires a proper purpose, and the Court of Chancery has limited—correctly, we think—the scope of that access to documents that are necessary and essential to that purpose. Any change to this statutory inspection regime is, in our opinion, within the legislature's province, not ours. Of course, parties are free to contract around these limitations by including an unconditional right of inspection. But in the case of the Partnerships, that course was not followed. Instead, the Partnerships' contractual inspection provisions mirrored the statute's. Those provisions should, in our opinion, be interpreted consistently with our interpretation of the statute, which is what we have tried to do in this dissent. We would affirm the Court of Chancery's judgment.

---

[124] The trustees spoke as agents of, and on behalf of, the trusts, which are the plaintiffs in this case.